IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA        :

        v.                      :       CRIMINAL NO. 11-251-8

MIGUEL ORTIZ                    :

GOVERNMENT'S CONSOLIDATED RESPONSE
AND MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT MIGUEL ORTIZ'S OMNIBUS PRE-TRIAL MOTIONS

        The United States of America, through its attorneys, Zane

David Memeger, United States Attorney, and Ashley K. Lunkenheimer

and Sozi Pedro Tulante, Assistant United States Attorneys,

respectfully submits this consolidated response to Defendant

Miguel Ortz's Omnibus Pre-Trial Motions.

I.   INTRODUCTION

        The Second Superseding Indictment charges nine defendants

with drug and firearms offenses stemming from their participation

in a sophisticated, far-reaching drug organization, the Drug

Trafficking Group ("DTG"), that distributed more than 300

kilograms of cocaine during the life of the conspiracy from a

warehouse in Philadelphia.  Miguel Ortiz was one of the cocaine

suppliers for the DTG.  He is charged in Count One of the Second

Superseding Indictment with conspiracy to distribute 5 kilograms

or more of cocaine, 28 grams or more of cocaine base, and

marijuana, in violation of 21 U.S.C. § 846.  Presently before the

Court are nine pre-trial motions that Ortiz has filed.

The government will respond to each in turn.

II. **RESPONSE TO MOTION TO SUPPRESS INFORMATION DERIVED FROM GPS TRACKING DEVICE**

Relying on the Supreme Court's January 23, 2012 opinion in United States v. Jones, 132 S. Ct. 945 (2012), Ortiz asks this Court to suppress information derived from Drug Enforcement Administration ("DEA") agents' placement and monitoring of a Global Positioning System ("GPS") tracking device on his vehicle. In a nutshell, Ortiz contends that the use of the GPS device without first obtaining a search warrant violated his Fourth Amendment rights to be free from unreasonable searches and seizures.

This Court should deny Ortiz's motion for the reasons that are described below.

A. **Relevant Factual Background**

The investigation from which the above charges resulted can be summarized as follows:

1. **DEA Agents Receive Credible Information of a Large-Scale Drug Trafficking Group Operating in Philadelphia**

The lead agent in the investigation was Special Agent David Pedrini, a 13-year veteran of the DEA who has participated in hundreds of drug investigations and received specialized in drug interdiction and was familiar with common tactics employed by

drug dealers.  SA Pedrini was joined in the investigation by other agents, including SA Paul Gimbel, who were also experienced with and trained in conducting drug investigations.

On October 10, 2010, SAs Pedrini and Gimbel received information from a Source of Information ("the SOI")[1] who has provided reliable information in the past that, among other things, resulted in multiple indictments and seizures of illegal narcotics.  The SOI stated that people close to him had told him that Nelson Rodriguez, a.k.a. "Compi," is a Puerto Rican male who operates a drug trafficking group, the DTG, that distributes between 50-75 kilograms of cocaine biweekly from a warehouse located at 3075 Jasper Street, Philadelphia, with separate entrances on Helen Street and Jasper Street.  According to the SOI, the warehouse was in the name of Gribbin Ortiz and was equipped with security cameras outside of each entrance.  The SOI said that Nelson Rodriguez used the warehouse to store narcotics and drug proceeds.  The SOI then identified Angel Ayala-Aponte as a close associate of Nelson Rodriguez and a member of the DTG.  A criminal records check showed that Rodriguez and Ayala-Aponte each had multiple prior felony convictions for cocaine trafficking, for which they served prison sentences.

---

[1]    The SOI also has personal animosity against Nelson Rodriguez.

3

Consulting property records, agents confirmed that the warehouse was indeed nominally owned by Gribbin Ortiz and, based on surveillance, saw two security cameras at each entrance to the warehouse, just as the SOI had said.  They also saw that the warehouse — situated less than a block from a public middle school — extends an entire city block and has rolldown doors on Jasper and Helen Streets.  The warehouse had no signage or any other evidence to indicate that legitimate business (such as an auto-repair shop, a commercial garage, etc.) was transacted there.  In fact, in the subsequent months of surveillance, agents observed no indication that the warehouse was a place of legitimate business.  Moreover, according to their observations, agents saw minimal vehicle traffic on the block of Jasper Street on which the warehouse is located because that block dead ends at a public school.  Based on their background and training, and the information from the SOI, the agents concluded that the location of the warehouse, and the presence of security cameras, is consistent with a place where narcotics or narcotics-related evidence would be stored.

When they began their surveillance of the warehouse, on October 27, 2010, the agents quickly concluded that extended, undetected live physical surveillance of the warehouse was nearly impossible because of its location.  Despite these limitations,

4

they did engage in limited surveillance of the warehouse on October 27 and 29, 2010, where they observed Nelson Rodriguez and Angel Ayala-Aponte, either together or separately, driving in and out of the warehouse in vehicles registered in other persons' names.  Also on those days, agents saw behavior that raised their suspicions.  For instance, on October 27, agents observed a Mitsubishi parked in front of the warehouse, and an unknown Hispanic male ("H/M") got out of the car.  He was greeted by Ayala-Aponte, and the two men went into the warehouse.  The H/M got out a few minutes later clutching a small brick-shaped bag, similar to the size of a cube of cocaine, which he immediately placed inside the front passenger compartment of the vehicle and drove away.

And on October 29, 2010, a red Chrysler minivan parked in front of the warehouse and drove into the warehouse a few minutes later.  The minivan, operated by a Hispanic female, exited 45 minutes later.  Later that day, Philadelphia Police officers stopped the car and engaged a drug-detection canine to perform a sniff on the exterior of the vehicle.  Though the sniff indicated a positive response for the presence of narcotics at the sliding rear doors, a subsequent search of the vehicle did not uncover any narcotics in the vehicle.

>    **2.    DEA Agents Receive Reliable Information that Ortiz Was Using his Pickup Truck in Connection with the DTG's Drug Dealing and Apply a GPS Device on that Truck**

On November 8, 2010, the SOI told SAs Pedrini and Gimbel that a Puerto Rican male known to the SOI as "Miguel" distributed large quantities of cocaine and collected drug proceeds for the DTG.  The SOI said that "Miguel," later identified as defendant Miguel Ortiz, was Nelson Rodriguez's cousin, lived at 3331 Emerald Street in Philadelphia, and drove a 2007 or 2008 blue Ford F-150 pickup truck as part of his drug dealing with the DTG.

Armed with this information, agents conducted physical surveillance in the vicinity of 3331 Emerald Street on the next day.  At 6:15 p.m., they saw a man – later identified as Miguel Ortiz's brother, Sencundino Ortiz – and a woman emerge from a red Nissan pickup truck, which was registered to Miguel Ortiz at that same address.  The two individuals then went to the door, where they were greeted by the defendant, who was already inside the residence, and all three of them went inside that residence.

Agents positively identified Miguel Ortiz by consulting DMV records, including his driver's license photo.  In addition, a check of Ortiz's criminal record showed that he had a federal conviction for cocaine distribution

Agents resumed surveillance of Ortiz's residence the next

morning.  While there, they saw a dark blue Ford F-150 pick-up truck with Pennsylvania license plate YTS 4488 (the "Blue Pickup") parked across from his house.  The Blue Pickup matched the description of the vehicle that the SOI said was used to transport drugs or proceeds for the DTG.  A check with motor-vehicle records revealed that this license plate is registered to a 2008 Ford pick-up truck owned by Secundino Ortiz.

Having confirmed much of the information from the SOI, agents arranged to place a GPS device on the Blue Pickup to determine where Ortiz was taking any proceeds or drugs.  Thus, on December 3, 2010, DEA personnel applied the GPS device ("Tracker #1") to the exterior undercarriage of the Blue Pickup when it was parked on Ortiz's block.  The device was battery operated, and was neither hard-wired into nor powered by the vehicle. DEA personnel left the area after attaching the GPS device to the Blue Pickup.

The device allowed agents to monitor the location of the Blue Pickup on a computer, which displayed the approximate location of the vehicle.  When using Tracker #1, the agents did not monitor the vehicle's location around the clock, but simply checked the GPS device periodically.  Because the investigation was in its early stages, agents at the time were not able to detect any pattern or anything notable based on their use of

Tracker #1 on the Blue Pickup.  On January 1, 2011, the battery

died on Tracker #1 and it stopped transmitting location

information about the Blue Pickup.

        3.    **Agents Continue to Investigate the DTG and Apply
A second GPS Device on the Blue Truck After
Observing it Entering the Warehouse to Pickup
Suspected Drug Proceeds**

Agents, however, continued to investigate the DTG, with

particular attention on the DTG's warehouse. Because of the

difficulties of conducting surveillance of the warehouse, agents

applied for, and obtained, an order permitting the installation

of cameras on two public utility poles to allow observations of

the entrances to the warehouse.

Starting on January 10, 2011, the agents again saw Nelson

Rodriguez and Ayala-Aponte at the warehouse going back and forth.

While the agents also saw vehicles coming to and going from the

warehouse, there was nothing that appeared unusual until January

20, 2011, when on that day and the following days agents observed

behavior consistent with distribution of narcotics and collection

of drug proceeds by the DTG.  Suspected cocaine customers of the

DTG went into the warehouse empty-handed and later left carrying

large bags that agents suspected contained kilogram quantities of

cocaine.  For example:

•     In the middle of the afternoon of January 20, 2011, a
Chevy Tahoe parked in front of the warehouse, and

8

Ayala-Aponte opened the Helen Street entrance.  At that time, the driver of the Tahoe, an unknown Hispanic Male ("H/M"), got out of the Tahoe, walked into the warehouse, while shaking Ayala-Aponte's hand.  The two men left the warehouse about 10 minutes later and briefly conversed.  Then, while holding or pressing something to his right side, the H/M entered the Tahoe and departed the area, as did Ayala-Aponte, separately, in his Toyota.

- On January 21, 2011, with Nelson Rodriguez in the warehouse, a H/M walked out of a Ford Explorer empty-handed and into the warehouse; 10 minutes later, he came out of the warehouse with a large, dark trash bag that appeared to be half full.  He placed the bag in the backseat of the vehicle and drove away.

- Approximately 20 minutes later, as Nelson Rodriguez remained in the warehouse, a maroon sedan arrived outside the warehouse at 1:00 p.m. and two H/Ms walked into the warehouse.  They left the warehouse 45 minutes later, with the driver carrying a large, dark trash bag that appeared to be half full and which he placed in the rear seats of the car.  The men entered the car and left the area.  Only a few minutes later, Nelson Rodriguez's Ford pickup exited the warehouse and departed the area.

- Later that afternoon, co-defendant Luis Rodriguez parked his pickup truck and walked into the warehouse.  He then left holding a black plastic shopping bag containing a brick-shaped object and placed the bag in the bed of his Ford pickup, and drove away.  (Records showed that Luis Rodriguez, like Nelson Rodriguez and Ayala-Aponte, had a prior conviction for cocaine-related offenses.)

- Luis Rodriguez returned to the warehouse a few hours later in his pickup.  As he waited in his pickup outside the warehouse, another pickup arrived and parked in front of his truck.  Both Luis Rodriguez and the driver of the other pickup exited their respective vehicles and walked into the warehouse.  A mere two minutes later, they both left the warehouse and left the area in their vehicles.

- On January 22, 2011, the Ford Explorer from the previous day parked in front of the warehouse; its driver (the same H/M as from the day before) got out, glanced up and down the street, a familiar counter-surveillance technique, and pulled a large trash bag from the rear passenger seat, which he carried into the warehouse.

- Later that day, a sedan parked in front of the warehouse at 1:29 p.m.  Two H/Ms got out of the car, with the driver picking up a white plastic shopping bag with suspected drug proceeds.  They both entered the warehouse.  They soon exited the property, with the driver holding a black plastic bag, which he put in the car before they both drove away from the area.  Ayala-Aponte walked out of the warehouse, looked around, and he and Nelson Rodriguez walked away.

Then, on the morning of January 24, 2011, agents saw on the pole camera that the same tan Ford Explorer that they had seen on the January 21 and January 22 return to the warehouse, while Nelson Rodriguez was inside.  The man who had been seen driving this vehicle entered the warehouse with a large duffle bag, which appeared heavy.  Less than ten minutes later, this man walked out of the warehouse with the duffle bag, which now appeared empty.  Reviewing this information through the prism of their experience, training, and overall knowledge of the investigation, the agents believed that DTG customers had received cocaine from the DTG and were returning with the drug proceeds.

So later in the afternoon of January 24, 2011, SA Pedrini drove to the vicinity of the warehouse to conduct physical

10

surveillance.  At 2:30 p.m., SA Pedrini saw Miguel Ortiz driving the Blue Pickup and backing it into the warehouse, with the bed of the truck exposed.  The warehouse's door closed after Ortiz entered the warehouse.  A few minutes later, SA Pedrini observed the warehouse door open and saw Ortiz drive the Blue Pickup, now with its bed covered, out of the warehouse.  Surveillance followed the Blue Pickup to a garage on the 1900 block of Westmoreland Street where Ortiz pulled the pickup inside and the garage doors closed after it.

Two hours later, agents saw Ortiz drive the Blue Pickup from his garage and park it on the 3300 block of Emerald Street.  He got out of the truck with two other men and all three entered his house.  An hour later, according to surveillance, Ortiz and these two men got out of Ortiz's row-house and went into the Blue Pickup, which Ortiz drove to a restaurant and ultimately to Sugarhouse Casino, where he parked it and entered the casino with the two men.

While the unoccupied Blue Pickup was in the parking lot, DEA personnel removed Tracker #1 from the exterior undercarriage of the Blue Pickup and replaced it with another GPS device ("Tracker #2"), which was fully charged and operable, but otherwise similar in every relevant respect to Tracker #1.

11

### 4. Ortiz is Seen Meeting with Truck Driver From Whom Agents Recover Over $2.3 million in Drug Proceeds

After Ortiz and his two associates returned to the Blue Pickup and drove away, agents followed them back to the warehouse.  The Blue Pickup parked in front of the warehouse and shortly thereafter Nelson Rodriguez walked out carrying a large dark trash bag that he placed in the rear passenger side of the truck.  Ortiz and his companions then travelled in the Blue Pickup back to his house on Emerald Street.

From January 25, 2011, until approximately February 8, 2011, Nelson Rodriguez and Ayala-Aponte were absent from the warehouse. In that period, defendants Luis Rodriguez, Andres Albaladejo, and Nelson Rodriguez-Ortiz, Nelson Rodriguez's son, appeared to coordinate the DTG's drug-trafficking operations at the warehouse.  They would arrive either together or separately, and access the warehouse using a remote-controlled key.  Notably, several times during that period, Albaladejo and Rodriguez-Ortiz would arrive at the warehouse and shortly thereafter Miguel Ortiz's Blue Pickup would arrive and reverse into the warehouse, then emerge mere minutes later.  On one such occasion, at 11:53 a.m. on January 28, 2011, the Blue Pickup, with the bed of the truck exposed, was observed going into the warehouse immediately after Albaladejo and Rodriguez-Ortiz had just arrived.  The truck

12

drove off two minutes later, this time with the bed covered.

Because agents believed that Miguel Ortiz had picked up drug proceeds from the warehouse on that day and the week before, they occasionally reviewed the GPS device to determine whether the Blue Pickup was going anywhere unusual.  Thus, when reviewing the information provided on Tracker #2, SA Pedrini saw that on January 28, 2011 at 1:54 p.m., the Blue Pickup was in the vicinity of Bath and Orthodox Streets in Philadelphia, close to the Betsy Ross Bridge exit of Interstate 95.  This drew his attention because, in his training and experience, he was aware that large drug traffickers often receive their drugs or drop off their proceeds to tractor trailer drivers.  In addition, SA Pedrini had participated in seizure of over $2 million in drug proceeds in that same area months before.  Reviewing an aerial map of the area, SA Pedrini saw a truck depot in that area, which underscored his belief that Ortiz was in that area to pick up drugs or drop off the drug proceeds he had picked up from the warehouse in the days before.       SA Pedrini drove to that area and waited.  He then saw Ortiz driving not the Blue Pickup but a dark grey Ford F-150, which did not have a tracker attached to it.  Ortiz pulled over near the intersection of Bath and Orthodox Streets in Philadelphia.  Then a red tractor trailer drove toward the parked truck a few minutes later; at that point, the pickup

13

truck pulled out in front of the tractor trailer and they both
entered a truck depot.

Minutes after they entered the depot, the tractor and
Ortiz's truck left the depot at the same time.  DEA agents
followed the trailer, stopped it, and searched it with the
consent of the driver.  In that vehicle, they found four duffle
bags that contained a total of approximately $2.3 million, all in
cash.  The money was in small denominations and wrapped tightly
in rubber bands.  A drug-detection canine gave a positive
indication that the money and/or bags had recently been in
contact with controlled substances, and an ION scan on a sample
of the recovered cash revealed the presence of cocaine.  Based on
their knowledge of the investigation, agents concluded that the
seized proceeds were the same ones that had been accumulated by
the DTG and collected by Miguel Ortiz in the week before.

Agents continued to monitor the Blue Pickup through Tracker
#2 until February 11, 2011, when the battery died.

B.   Legal Argument

1.   The Application of Tracker #2 on the Blue
     Pickup was Supported by Reasonable Suspicion.

In Jones, the Supreme Court affirmed the suppression of
location data generated by a GPS tracking device surreptitiously
affixed to a car without court authorization and monitored

14

continuously over a 28-day period.  <u>Jones</u>, 132 S. Ct. at 949
(holding "that the Government's installation of a GPS device on a
target's vehicle, and its use of that device to monitor the
vehicle's movements, constitutes a 'search'" within the meaning
of the Fourth Amendment)(footnote omitted).  Because the
government had installed a GPS device on the undercarriage of
Jones's vehicle without a valid warrant and had then monitored
the vehicle's location by means of satellite signals over the
course of 28 days, the Court affirmed the suppression of the
GPS-derived locational data.

The holding in <u>Jones</u> is limited.  While finding that
installation and use of a GPS device on a vehicle is a "search"
subject to Fourth Amendment standards, the Court left open
whether the search requires a warrant, probable cause, or
something less.  <u>See</u> <u>Jones</u>, 132 S. Ct. at 954; but see <u>id</u>. at 964
(Alito, J., concurring) ("where uncertainty exists with respect
to whether a certain period of GPS surveillance is long enough to
constitute a Fourth Amendment search, the police may always seek
a warrant").  <u>See</u> 132 S. Ct. at 954.  This case presents those
issues.

Not every Fourth Amendment intrusion requires a warrant or
probable cause; to the contrary, the general test is one of
reasonableness.  The Supreme Court "examine[s] the totality of

15

the circumstances" to determine whether a search or seizure is reasonable under the Fourth Amendment. Samson v. California, 547 U.S. 843, 848 (2006) (internal marks and citation omitted). Under that analysis, the reasonableness of a search or seizure is determined "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Id. (internal quotation mark omitted); see Wyoming v. Houghton, 526 U.S. 295, 300 (1999). Since Terry v. Ohio, 392 U.S. 1 (1968), the Court has identified various law enforcement actions that qualify as Fourth Amendment searches or seizures but that may still be conducted without either a warrant or probable cause. See, e.g., Samson, 547 U.S. at 847 (individualized suspicion not required for search of parolee's home or person); United States v. Flores-Montano, 541 U.S. 149, 155 (2004) (no reasonable suspicion required to remove, disassemble, and reassemble a vehicle's fuel tank during a border search); United States v. Knights, 534 U.S. 112, 118-21 (2001) (upholding search of probationer's home based on reasonable suspicion); Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 654-66 (1995) (random, suspicionless urinalysis drug testing of student-athletes permissible); Maryland v. Buie, 494 U.S. 325, 334 (1990) (properly limited protective sweep in conjunction with

16

in-home arrest can be conducted when searching officer possesses reasonable belief based on specific and articulable facts that area to be swept harbors individual posing danger to those on arrest scene); New Jersey v. T.L.O., 469 U.S. 325, 341-42 (1985) (upholding search of public school student based on reasonable suspicion); United States v. Place, 462 U.S. 696, 706 (1983) (upholding seizure of traveler's luggage on reasonable suspicion that it contains narcotics); United States v. Martinez-Fuerte, 428 U.S. 543, 554-55 (1976) (upholding suspicionless vehicle stops at fixed border patrol checkpoints).  Although the contexts of these cases vary, the underlying principles strongly support an exception to the warrant and probable-cause requirements in the GPS situation.

In applying the Supreme Court's balancing test to GPS tracking of vehicles on public roads, it is apparent that neither a warrant nor probable cause should be required.  See United States v. Marquez, 605 F.3d 604, 610 (8th Cir. 2010); United States v. Michael, 645 F.2d 252, 257-59 (5th Cir. 1981) (en banc).  The intrusion occasioned by installation of a tracking device on a vehicle is minimal.  Installation is much less intrusive than the typical stop and frisk of a person.  Nothing from the vehicle is removed, and usually no enclosed area is entered.  In this case, the DEA employed a "slap-on" device that

17

was battery operated, and was not wired to, nor drew power from, the Blue Pickup's engine.

With respect to the monitoring, the privacy interest, at least when the monitoring is for a limited time, is minimal.  A GPS tracking device conducts neither a visual nor an aural search of the item to which it is attached.  Cf. Smith v. Maryland, 442 U.S. 735, 741-42 (1979) (noting that pen register records only the numbers dialed from a phone and not the contents of any conversation).  The device, by itself, does not reveal who is in the car as driver or passenger, what the occupants are doing, or what they do when they arrive at their destination.  Unless combined with other information, it provides information only about the vehicle's location.  And the information that the tracking device reveals about the vehicle's location could also be obtained by means of visual surveillance, albeit less efficiently and at some risk to surveilling agents.  The Supreme Court "has recognized significant differences between motor vehicles and other property which permit warrantless searches of automobiles in circumstances in which warrantless searches would not be reasonable in other contexts."  United States v. Chadwick, 433 U.S. 1, 12 (1977); see also Cardwell v. Lewis, 417 U.S. 583, 590 (1974); South Dakota v. Opperman, 428 U.S. 364, 368 (1976).

On the other hand, the minimal protection of an individual's

18

privacy from obtaining a warrant before installing a tracking device on a vehicle would come at great expense to law enforcement investigations.  Requiring a warrant and probable cause before officers may attach a GPS device to a vehicle would seriously impede the government's ability to investigate drug trafficking, terrorism, and other crimes.  Law enforcement officers could not use GPS devices to gather information to establish probable cause, which is often the most productive use of such devices.  Thus, the balancing of law enforcement interests with the minimally intrusive nature of GPS installation and monitoring makes clear that a showing of reasonable suspicion suffices to permit use of a "slap-on" device.  Just as this balancing allows a stop and frisk of a person in the <u>Terry</u> context, to follow up on investigative leads and assure the safety of officers, so too only reasonable suspicion is needed for the minimally invasive act of following a vehicle through use of a GPS device.

In this case, the DEA had ample reasonable suspicion to support the application of Tracker #2 to the Blue Pickup.[2]

---

[2]     Because the government does not expect at trial to introduce any evidence obtained from the use of Tracker #1 and, in any event, no evidence was obtained with the use of Tracker #1 to justify the application of Tracker #2, the government will solely address the lawfulness of the government's application and use of Tracker #2.

"Reasonable suspicion" is defined as "a particularized and objective basis for suspecting that the particular person" is involved in criminal activity, based upon the totality of the circumstances. United States v. Nelson, 284 F.3d 472, 478 (3d Cir. 2002), quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981). In formulating reasonable suspicion, the officers' "experience and specialized training may allow them to make inferences and deductions from information that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002). The Supreme Court has held that "reasonable suspicion" is a standard under which "the likelihood of criminal activity need not rise to the level required for probable cause," and is one which "falls considerably short of satisfying a preponderance of the evidence standard." Id. at 273-74, quoting United States v. Sokolow, 490 U.S. 1, 7 (1989); see also United States v. Valentine, 232 F.3d 350, 353 (3d Cir. 2000). Reasonable suspicion is a less demanding standard than probable cause in the sense that it can be established with information that is different in quantity or content than that required to establish probable cause, and that is less reliable than that required to show probable cause. Alabama v. White, 496 U.S. 325, 330 (1990).

When they placed Tracker #2 on the Blue Pickup on January 24, 2011 DEA agents had reasonable suspicion (indeed, as

discussed later, probable cause) that Ortiz was using the Blue
Pickup to transport drugs or drug proceeds for the DTG.

Drawing from their experience, training, knowledge of the
investigation, and around-the-clock review of pole camera
recordings, agents saw, starting January 20, 2011 and continuing
to the following days, activity that was consistent with drugs
being picked up, and proceeds being dropped off, by DTG customers
at the warehouse.  Then, in the wake of this flurry of activity,
when agents saw the defendant drive the Blue Pickup into the
warehouse on January 24, 2011, this confirmed their belief that
he was picking up proceeds that had just been delivered in the
days before by the DTG customers. The timing and circumstances of
the defendant's use of the Blue Pickup on that day buttressed the
agents' assessment.

First, the Blue Pickup was in the warehouse for only a few
minutes, showing that this was not a social visit and certainly
not a business visit, since the agents had already confirmed that
there was no legitimate business being transacted in the
warehouse.  And when Blue Pickup, with the defendant driving,
left the warehouse only a few minutes later with the bed of the
truck now covered, agents had reasonable and ample grounds to
believe that Ortiz had received contraband in the warehouse and
was secreting that contraband in the bed of the truck.

21

Second, after leaving the warehouse, the defendant drove the Blue Pickup directly to a garage nearby, where he drove it inside, closed the doors, and remained for a few hours.  He then emerged with the vehicle, accompanied by two unknown men, and parked it near his house.  This activity was more than just suspicious, it bolstered the agents' judgment, based on their knowledge and experience with investigating sophisticated drug organizations, that the defendant had drug proceeds in the bed of that truck and unloaded and counted it with the two men inside the warehouse.

It should also be recalled that the agents were not weighing the defendant's activities in a vacuum.  Rather, they interpreted it in the context of reliable information from the SOI that the DTG distributed drugs from the warehouse and used it to store drugs and drug proceeds, and that Ortiz was working for the DTG by using the Blue Pickup to transport proceeds and drugs on its behalf.  As shown above, agents corroborated all of the pertinent information provided by the SOI about the DTG, confirming the location and physical description of the warehouse, that it was owned by Gribbin Ortiz, and that Rodriguez and Ayala-Aponte would be seen there.[3]  The agents also verified the specific

---

[3]     As shown above, certain peculiarities about the warehouse itself substantiated the agents' conclusion, and the SOI's information, that it was the locus of possible illegal

information that the SOI has offered about Ortiz, including where he lived, his name and identity, and his association with the Blue Pickup, which was parked near his house.

The agents' corroboration of this detailed information provided sufficient reasonable suspicion to warrant placement of the GPS on the Blue Pickup. See Adams v. Williams, 407 U. S.143 (1972) (an informant tip may provide sufficient reasonable suspicion to support an investigatory traffic stop); Alabama v. White, 496 U. S.325 (1990) (anonymous tip that could be corroborated by police sufficient for traffic stop).

As the Supreme Court held in Illinois v. Gates, 462 U.S. 213, 232 (1983), where, as here, the agents were able to corroborate some of the SOI's account, they were entitled to rely on his specific allegations of criminal activity as accurate, especially when it was buttressed by the agents own observations. That is, because the SOI was right about some things, he is "more probably right about other facts." Gates, 462 U.S. at 244 (internal quotations and citations omitted).

--------

activity.  It was situated in an area that minimized the possibility of surveillance, which agents knew was typical of such so-called "stash houses."  Moreover, there was an unreasonable focus on security, as evidenced by multiple high-tech security cameras at the entrances of the warehouse, and on secrecy, as reflected in the fact that the door to the warehouse always remained down to conceal any possible illegal activities inside the warehouse.

As part of the calculus in determining whether reasonable suspicion existed, it is notable that the individuals that the SOI had identified as key members of the DTG – Ortiz, Nelson Rodriguez, and Ayala-Aponte - as well as another DTG member, Luis Rodriguez, had criminal convictions and had served time in prison for cocaine trafficking.  The fact that individuals identified by a confidential informant have prior drug offenses is a factor tending to corroborate the informant. See United States v. Carter, 2008 WL 410118, *3 (3d. Cir.  Feb. 15, 2008) (recognizing that fraternization with known drug dealers "in combination with other interrelated factors can provide probable cause."); United States v. Artez, 389 F.3d 1106, 1114- 15 (10th Cir. 2004) ("[C]riminal history, combined with other factors, can support a finding of reasonable suspicion or probable cause."); United States v. Vinson, 414 F.3d 924, 930 (8th Cir. 2005) (target's criminal history cited as a factor corroborating informant's tip and supporting a finding of probable cause).

In light of this evidence, combined with the agents' experience in law enforcement, when they installed Tracker #2 on the Blue Pickup, they certainly had at least "a particularized and objective basis for suspecting" that Ortiz was carrying drugs, drug proceeds, or other contraband in the Blue Truck and, as a result, to place the GPS device on the vehicle.

At the hearing, the government anticipates that the defense will ask the Court to follow the decision by Judge Pratter in United States v. Katzin, No. 11-226, 2012 WL 1646894 (E.D.Pa. May 9, 2012), suppressing evidence obtained as a result of the warrantless use of a GPS device to track a vehicle.  In rejecting the government's reasonable suspicion argument, the court in Katzin stated:

> What the Government has failed to show, however, is that in this case it had "special needs, beyond the normal need for law enforcement" which would have made "the warrant and probable-cause requirement impracticable."  See New Jersey v. T.L.O., 469 U.S. 325, 351 (1985).

Id. at * 5 (emphasis in original).  The court then said that the government had no particular reason to believe that another burglary was imminent at the time the device was installed, such that it could not obtain a warrant.  Id.

This analysis is flawed.  While certainly the individual's and the government's interests must be weighed in determining the applicability of the warrant requirement, the Supreme Court has never held that this assessment is made on a case-by-case basis, as Katzin suggests.  The Court has never, for instance, required that each investigatory stop within the scope of Terry v. Ohio, 392 U.S. 1 (1968),

be analyzed to determine whether relaxation of the warrant
requirement is appropriate in each particular instance.  To
the contrary, the Court has consistently balanced individual
interests in privacy against the state's interest in law
enforcement while focusing on the situation presented as a
class rather than the circumstances of the particular case.
The Court explained:

> The determination of the standard of reasonableness
> governing <u>any specific class of searches</u> requires
> "balancing the need to search against the invasion
> which the search entails." . . . On one side of the
> balance are arrayed the individual's legitimate
> expectations of privacy and personal security; on the
> other, the government's need for effective methods to
> deal with breaches of public order.

<u>New Jersey v. T.L.O.</u>, 469 U.S. 325, 337 (1985) (emphasis
added) (quoting <u>Camera v. Municipal Court</u>, 387 U.S. 523,
536-37 (1967)).  <u>Accord</u> <u>United States v. Place</u>, 462 U.S.
696, 703 (1983) ("The exception to the probable-cause
requirement for limited seizures of the person recognized in
<u>Terry</u> and its progeny rests on a balancing of the competing
interests to determine the reasonableness of <u>the type of
seizure involved</u> within the meaning of 'the Fourth
Amendment's general proscription against unreasonable

searches and seizures.'") (emphasis added) (quoting <u>Terry</u>, 392 U.S. at 20).

When applying this approach to various circumstances in the cases described above, involving situations such as searches of school students, parolees, travelers, and at a border crossing, the Court has said nothing about the exigencies of the particular search at issue.  For all of the reasons that the government articulated earlier, the required balancing of interests dictates that the minimal intrusion occasioned by the installation of a GPS device is allowed without a warrant.  The privacy interests of a particular defendant are protected not by a new balancing assessment in each case, but by application of the reasonable suspicion requirement, demanding that the government establish based on articulable facts a justified suspicion of criminal activity warranting the intrusion. The <u>Katzin</u> court erred in not applying the reasonable suspicion test to the use of a GPS device, and this Court cannot espouse that flawed rationale.

27

2.    **The Application of the GPS Device and Subsequent Monitoring was Supported by Probable Cause and no Warrant was Required under the Automobile Exception.**

The warrantless GPS monitoring was also supported by probable cause for the same facts set forth above in support of reasonable suspicion.  Probable cause to conduct a search exists "when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001), citing Illinois v. Gates, 462 U.S. 213, 238 (1983).  When they put the GPS device on the the Blue Pickup on January 24, 2011, the agents had information at their disposal that Miguel Ortiz was using this truck to transport drug-related contraband for the DTG.  Given this probable cause, and the fact that the object of the search was a motor vehicle, the agents were not obligated to obtain a warrant under the automobile exception to the warrant requirement.  Cf.  New York v. Class, 475 U.S. 106, 117-119 (1986) (officer's momentary reaching into the interior of a vehicle to expose the VIN was reasonable where officer had "some probable cause focusing suspicion on the individual affected by the search").

The automobile exception to the warrant requirement permits law enforcement officers to stop and search an automobile without

a warrant if "probable cause exists to believe it contains

contraband." Pennsylvania v. Labron, 518 U.S. 938, 940 (1996).

Under this exception, "where there [is] probable cause to search

a vehicle, a search is not unreasonable if based on facts that

would justify the issuance of a warrant, even though a warrant

has not been actually obtained." Maryland v. Dyson, 527 U.S.

465, 467 (1999) (internal quotations and citation omitted).  The

exception "allows warrantless searches of any part of a vehicle

that may conceal evidence . . . where there is probable cause to

believe that the vehicle contains evidence of a crime."  Karnes

v. Skrutski, 62 F.3d 485, 498 (3d Cir. 1995), quoting United

States v. McGlory, 968 F.2d 309, 343 (3d Cir. 1992); see also

United States v. Salmon, 944 F.2d 1106, 1123 (3d Cir. 1991)

(noting the automobile exception permits warrantless searches of

any part of vehicle, including containers, if there is probable

cause to believe the vehicle contains contraband).

The rationale of the automobile exception was stated by the

Supreme Court nearly a century ago:

> [T]he guaranty of freedom from unreasonable searches and
> seizures by the Fourth Amendment has been construed,
> practically since the beginning of the government, as
> recognizing a necessary difference between a search of a
> store, dwelling house, or other structure in respect of
> which a proper official warrant readily may be obtained and
> a search of a ship, motor boat, wagon, or automobile for
> contraband goods, where it is not practicable to secure a
> warrant, because the vehicle can be quickly moved out of the

locality or jurisdiction in which the warrant must be
sought.

Carroll v. United States, 267 U.S. 132, 153 (1925).  The
exception allows a warrantless search even of a vehicle which has
been stopped or seized by the police, and evidently cannot move
until the search is completed.  See, e.g., United States v. Ross,
456 U.S. 798, 807 n.9 (1982) (summarizing cases).  The Court's
decisions in this regard are "based on the practicalities of the
situations presented and a realistic appraisal of the relatively
minor protection that a contrary rule would provide for privacy
interests."  Id.

Accordingly, the use of a GPS device, both to install the
device at the opportune time and then track a moving vehicle,
does not require a warrant.  At most, if the argument presented
above concerning reasonable suspicion is inaccurate, it requires
a showing of probable cause, which was abundantly present in this
case.

Here, the investigation agents – the persons with the most
knowledge about this investigation – based on the information
amassed during the investigation, viewed through the prism of
their experience, were thoroughly convinced that the defendant
was using the Blue Pickup to carry contraband.  As courts have
repeatedly held, the professional judgment of the agents about

30

the most likely place contraband would be located is entitled to particular deference.  See United States v. Givan, 320 F.3d 452, 458 (3d Cir. 2003) (acknowledging that the Supreme Court has "accorded great deference to the officer's knowledge of the nature and the nuances of the type of criminal activity that he observed in his experience, almost to the point of permitting it to be the focal point of the analysis.").[4]

If Ortiz asks this Court to embrace Katzin and that opinion's rejection of the government's alternative argument that a warrantless search based on probable cause is allowed in the GPS context, the Court should decline that invitation because Katzin also erred on this point.  In Katzin, while not disputing the probable cause supporting the use of the GPS device, the court nevertheless denied the government's argument on two grounds:  first, because the government did not present probable cause that contraband was contained in the vehicle at the time of the installation; and second, because there was no exigency at the time of the installation.  Katzin, 2012 WL 1646894, at *6.

_____

[4]     As the Supreme Court has explained, that Ortiz may have innocent explanations for his conduct and use of the Blue Pickup is not enough to defeat probable cause. See Gates, 462 U.S. at 243-44 n. 13 (although "innocent behavior frequently will provide the basis for showing of probable cause ... [i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts").

These rationales are unpersuasive.  While, to be sure, the automobile exception was developed in the context of the search of a vehicle for contraband, the Supreme Court's consistent rationale -- that an automobile is mobile, and that the minimal additional interests served by obtaining a warrant are defeated by the ordinary need for alacrity -- is surely as applicable where the "search" is the placement of a GPS device rather than entry to the vehicle and a full search for contraband.  Indeed, the search at issue in this case is far less disruptive and intrusive than the search for contraband which the automobile exception allows.

The "basis for this rule," the Supreme Court explained, concerns the nature of an automobile, not its contents.  United States v. Ross, 456 U.S. at 805.  The Court has long held that a warrantless search of a vessel is "reasonable" under the Fourth Amendment based on a historical assessment.  As Ross recounted, the Supreme Court in Carroll v. United States, 267 U.S. 132, "noted that historically warrantless searches of vessels, wagons, and carriages - as opposed to fixed premises such as a home or other building - had been considered reasonable by Congress," notably including the first Congress which enacted laws contemporaneously with adoption of the Fourth Amendment.  Ross, 456 U.S. at 805.

32

Under this reasoning, the "search" at issue here is reasonable without a warrant if there is probable cause that the vehicle will be used in criminal activity, just as actual warrantless entry to the vehicle to search for contraband is allowed.

Once that result is accepted, the Katzin court's second explanation falls as well.  It is irrelevant, under Supreme Court precedent, whether, "in this case, there was more than ample time for the Government to have obtained a warrant before employing the GPS device on the Katzin Caravan."  Katzin, 2012 WL 1646894, at *6.  In Maryland v. Dyson, 527 U.S. 465 (1999) (per curiam), the Supreme Court summarily reversed a similar decision, stating:

> [U]nder our established precedent, the "automobile exception" has no separate exigency requirement. . . . [In] Pennsylvania v. Labron, 518 U.S. 938 [] (1996) (per curiam), we repeated that the automobile exception does not have a separate exigency requirement:  "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more."  Id., at 940 . . . .

Dyson, 527 U.S. at 466-67.  Accordingly, the Katzin court should have denied suppression on the basis of the government's showing of probable cause, and that decision should not be followed by this Court.

3.    **The GPS-related Evidence Cannot be Suppressed Because the Agents Were Acting in Objective Good Faith Reliance on Existing Law.**

If the arguments presented above concerning reasonable suspicion, probable cause, and the absence of a warrant somehow fall short, the evidence obtained through the warrantless use of the trackers cannot be suppressed because the agents acted in objective good faith on the basis of existing law.

In a series of recent decisions, the Supreme Court has emphasized and reinforced the principle that "[t]he fact that a Fourth Amendment violation occurred - *i.e.*, that a search or arrest was unreasonable - does not necessarily mean that the exclusionary rule applies.  Indeed, exclusion 'has always been our last resort, not our first impulse,' and our precedents establish important principles that constrain application of the exclusionary rule."  <u>Herring v. United States</u>, 555 U.S. 135, 140 (2009).  The Court continued:  "the exclusionary rule is not an individual right and applies only where it 'result[s] in appreciable deterrence.'  We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation.  Instead we have focused on the efficacy of the rule in deterring Fourth Amendment violations in the future."  <u>Id.</u> at 141 (citations omitted).

In part, the Supreme Court reaffirmed, "the benefits of deterrence must outweigh the costs.  'We have never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence.'  '[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs.'"  Id. (citations omitted).  "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free . . . ."  Id.[5]

Thus, Herring concluded, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."  Id. at 144.  Otherwise, the cost of applying the exclusionary rule considerably outweighs any deterrent effect to be had from punishing merely negligent or entirely blameless conduct.

Notably, the Court has enforced these principles in denying suppression where an officer relied in objective good faith on statutory or case law which later changed.  In that situation, the officer did not commit any error, let alone act in a grossly

---

[5]  The decision in Hudson v. Michigan, 547 U.S. 586 (2006), made the same points, at considerable length.  There, the Supreme Court concluded that the exclusionary rule never applies to a violation of the knock-and-announce rule.

negligent fashion.  The officer simply obeyed the then-binding rule of the legislature or the courts, and any deterrent purpose of sanctioning such conduct is completely absent.

Most recently, in <u>Davis v. United States</u>, 131 S. Ct. 2419 (2011), the Court held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule."  <u>Id.</u> at 2423-24.  In <u>Davis</u>, the defendant presented a motion to suppress on the basis of <u>Arizona v. Gant</u>, 556 U.S. 332 (2009), which narrowed the circumstances in which police may search a vehicle incident to the arrest of its driver, and overruled the earlier, more permissive ruling in <u>New York v. Belton</u>, 453 U.S. 454 (1980). The <u>Davis</u> Court held that the exclusionary rule was inapplicable to the conduct of an officer who acted in good faith reliance on <u>Belton</u> before <u>Gant</u> was decided.  The Court held that "suppression would do nothing to deter police misconduct in these circumstances," and unacceptably "would come at a high cost to both the truth and the public safety . . . ."  <u>Davis</u>, 131 S. Ct. at 2423.

<u>Davis</u> is in line with other Supreme Court rulings declining to apply the exclusionary rule where the mistakes at issue are those of legislators or judges, rather than the officers themselves.  <u>See, e.g.</u>, <u>United States v. Leon</u>, 468 U.S. 897, 920-

36

21 (1984) (exclusionary rule does not apply where an officer relies in good faith on the magistrate's assessment of probable cause in issuing a warrant; "Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations."); Massachusetts v. Shepard, 468 U.S. 981, 987-88 (1984) (same); Illinois v. Krull, 480 U.S. 340, 349-50 (1987) (applying the good-faith exception to searches conducted in reasonable reliance on subsequently invalidated statutes; "legislators, like judicial officers, are not the focus of the rule"); Arizona v. Evans, 514 U.S. 1, 14 (1995) (good-faith reliance on erroneous information concerning an arrest warrant in a database maintained by judicial employees).[6]

Thus, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force and exclusion cannot pay its way." Davis, 131 S. Ct. at 2427-28 (internal citations and quotation marks omitted).  That is the situation here.

Before Jones, every court of appeals to consider the

---

[6]     In Herring, the Court extended the exception to apply in a case where the erroneous record-keeping was the product of negligence of police employees.  The Court held that "isolated," "nonrecurring" police negligence is not sufficient to warrant the extraordinary sanction of exclusion.  See 555 U.S. at 137, 144.

37

question -- with the exception of the D.C. Circuit's decision in
the case affirmed by the Supreme Court in <u>Jones</u> – had concluded
that, in light of the Supreme Court's decision in <u>Knotts</u>, police
did not need to obtain a warrant to install a GPS tracking device
on the exterior of a vehicle or to use that device to monitor the
vehicle's movements on public roads.  In <u>United States v. Knotts</u>,
460 U.S. 276 (1983), the Supreme Court held that the use of an
electronic beeper (which had been placed in a drum with the
consent of its owner) to track a vehicle on public streets "was
neither a 'search' nor a 'seizure' within the contemplation of
the Fourth Amendment."  <u>Id.</u> at 285.  A number of courts of
appeals understandably relied on <u>Knotts</u> to hold that the
installation and monitoring of a tracking device (including a
slap-on GPS device) on a vehicle is not a "search" or "seizure"
subject to the Fourth Amendment's warrant requirement.  <u>See</u>
<u>United States v. Cuevas-Perez</u>, 640 F.3d 272, 275-76 (7th Cir.
2011); <u>United States v. Garcia</u>, 474 F.3d 994, 996-98 (7th Cir.
2007); <u>United States v. Pineda-Moreno</u>, 591 F.3d 1212 (9th Cir.
2010); <u>United States v. McIver</u>, 186 F.3d 1119, 1127 (9th Cir.
1999).  Other courts of appeals held that the use of tracking
devices required reasonable suspicion but not a warrant based on
a judicial finding of probable cause, a threshold easily met in
this case.  <u>See</u> <u>United States v. Marquez</u>, 605 F.3d 604, 610 (8th

38

Cir. 2010); <u>United States v. Michael</u>, 645 F.2d 252, 257-59 (5th Cir. 1981) (en banc).[7]

In light of the consensus among these courts that a warrant was not required to conduct GPS surveillance, a reasonable police officer would believe that the Fourth Amendment's warrant requirement did not apply to such circumstances, and there would be no deterrent value in suppressing evidence obtained as a result.  The sole exception of the D.C. Circuit's decision in <u>United States v. Maynard</u>, 615 F.3d 544, 555-66 (D.C. Cir. 2010), decided a mere five months before the agents installed Tracker #2, surely cannot alter this result.  The fact that federal judges could not agree regarding the propriety of GPS vehicle monitoring only confirms that the agent's action was anything but the type of deliberate or grossly negligent misconduct to which the exclusionary rule exclusively applies.

Notwithstanding the good faith reliance on then existing

_____

[7]     Although not "binding precedent" under <u>Davis</u>, many district courts had likewise approved warrantless GPS surveillance prior to <u>Jones</u>.  <u>See, e.g.</u>, <u>United States v. Narrl</u>, 789 F. Supp. 2d 645, 652 (D.S.C. 2011); <u>United States v. Walker</u>, 771 F. Supp. 2d 803, 808-13 (W.D. Mich. 2011); <u>United States v. Sparks</u>, 750 F. Supp. 2d 384, 390-96 (D. Mass. 2010); <u>United States v. Jesus-Nunez</u>, 2010 WL 2991229, at *4-*5 (M.D. Pa. 2010); <u>United States v. Burton</u>, 698 F. Supp. 2d 1303, 1305-08 (N.D. Fla. 2010); <u>United States v. Coombs</u>, 2009 WL 3823730, at *4-*5 (D. Ariz. 2009); <u>United States v. Williams</u>, 650 F. Supp. 2d 633, 668 (W.D. Ky. 2009); <u>United States v. Moran</u>, 349 F. Supp. 2d 425, 467-468 (N.D.N.Y. 2005).

law, Ortiz may insist that this Court endorse the Katzin court's decision declining to apply the good-faith exception. However, Katzin was wrongly decided on this issue as well. There, the court characterized the prevailing authority prior to Jones as a "split" in a minority of circuits, without any applicable precedent in the Third Circuit, and suggested that such a state of affairs could never permit good faith reliance. Katzin, 2012 WL 1646894, at *7. This is not an accurate description of the legal landscape at the time, as shown above.

And, moreover, the very rationale of the majority opinion in Jones -- that installation of a GPS device is a "search" because it constitutes a "trespass" -- marked a radical shift in Fourth Amendment jurisprudence which no reasonable officer could conceivably be charged with anticipating. As Justice Alito explained at length in his concurring opinion, Jones, 132 S. Ct. at 959-60, the majority revived a concept which had apparently been laid to rest in Katz v. United States, 389 U.S. 347 (1967). Katz had altered Fourth Amendment analysis to focus on reasonable expectation of privacy in determining whether an action constituted a Fourth Amendment search, the same analysis which numerous courts then applied in finding that no warrant was required for use of a GPS device on a vehicle. Even the D.C. Circuit decision in Maynard (which the Supreme Court affirmed in

40

_Jones_) itself did not anticipate the _Jones_ majority's trespass rationale, and analyzed the issue exclusively under the reasonable-expectation-of-privacy rubric.  The showing of good faith in the agent's actions in this case is therefore manifest. To put it differently, it is impossible to see how the agents in this case, acting before the announcement of the trespass theory in _Jones_, could have anticipated this development.

And the absence of direct, binding precedent in the Third Circuit[8] regarding the warrantless use of a tracking device is not a sufficient basis, as the _Katzin_ court held, for punishing

---

[8]     Many courts have employed the good faith doctrine to deny suppression in circuits where clear precedent (overruled in _Jones_) validated the warrantless installation of a GPS device. These include one decision in the Eighth Circuit, _United States v. Amaya_, -- F. Supp. 2d --, 2012 WL 1188456, *5-8 (N.D. Iowa 2012), and many in the Ninth Circuit, _see, e.g._, _United States v. Aquilar_, 2012 WL 1600276, *2 (D. Idaho 2012); _United States v. Heath_, 2012 WL 1574123 (D. Mont. 2012); _United States v. Martinez_, 2012 WL 1378491, *2 (E.D. Cal. 2012); _United States v. Leon_, -- F. Supp. 2d --, 2012 WL 1081962 (D. Hawaii 2012); _United States v. Fata_, 2012 WL 1715496 (D. Nev. 2012); _United States v. Nwobi_, 2012 WL 769746 (C.D. Cal. 2012).  However, the court in _United States v. Lee_, 2012 WL 1880621, *6-8 (E.D. Ky. 2012), followed _Katzin_'s reasoning.  Relying on language in _Davis_, the court in _Lee_ held that an officer acts in objective good faith only when he relies on "binding appellate precedent," which was absent in the Sixth Circuit as well as the Third Circuit.  _Lee_ suffers from the same flaws as the Katzin opinion here, as it does not address the penumbra of Supreme Court precedent which suggested the validity of warrantless GPS installation, the marked break in precedent represented by the majority decision in _Jones_, or the broader conclusion of recent Supreme Court decisions that the exclusionary rule should only apply to culpable police conduct.

agents who, based on the near-unanimity of the case law at the time, reasonably believed that they were acting in conformity with the then-existing law and did not exhibit the deliberate, reckless, or grossly negligent behavior that can be sanctioned by exclusion.  Actually, in <u>Davis</u>, Justice Breyer, expressing disagreement with the majority's focus on officer culpability, explained that "an officer who conducts a search that he believes complies with the Constitution but which, it ultimately turns out, falls just outside the Fourth Amendment's bounds is no more culpable that an officer who follows erroneous 'binding precedent.'  Nor is an officer more culpable where circuit precedent is simply suggestive rather than 'binding.'"  <u>Davis</u>, 131 S.Ct. at 2439.

In light of the state of the law before <u>Jones</u>, suppression here would lead to no appreciable deterrence while excluding inculpatory evidence at substantial social cost.  Suppression is not warranted and this Court should deny Ortiz's motion.

42

III. RESPONSE TO MOTION TO PRECLUDE VIDEO

In this motion, the defendant seeks to preclude the government from offering testimony from agents regarding their observation of pole camera recordings, which were deleted due to a computer malfunction and not as a result of any bad faith or intentional conduct by any government agent.  The motion should be denied.

A.   Relevant Factual Background

As noted above, during this investigation agents used two pole cameras to record the area outside of the two entrances of the DTG's warehouse, on Jasper and Helen Streets, respectively. One camera was mounted on a utility pole on the intersection of Jasper and Clearfield Streets, and the other on a utility pole on the intersection of Helen and Clearfield Streets.

Beginning on January 10, 2011, the cameras captured live images of the area in and around the warehouse entrances.  The recordings generated by the cameras were stored on a folder on a data storage unit at the DEA Field Office in Philadelphia and were available for later review by the agents.  That storage device also contained separate folders with recordings from cameras that were being used in other DEA investigations.

The pole camera recordings were stored as .PIC files, which are snapshots or still photographs that, with aid of a third-

party software, can be viewed as running video.  Agents periodically reviewed these recordings and took detailed notes, which they later reduced to reports, summarizing what they saw. In their reports, agents identified any unusual activity in and around the warehouse, described any vehicles or persons entering and leaving the warehouse, and took care to note the time of any relevant activity.  From January 10, 2011 until March 29, 2011, when the agents executed a search warrant of the warehouse and arrested many of the defendants in this case, agents prepared several reports, based on notes of their contemporaneous review of the videos, each summarizing approximately one week of pole camera surveillance.

The cameras were removed from the utility poles on April 11, 2011, at the instruction of the agents.  Then, on April 13, 2011, DEA technical personnel downloaded what they believed were the complete recordings from both cameras from the data storage unit to hard drives, which they gave to the agents.  But when the agents reviewed the contents of the hard drive, they saw that it was missing the footage from January 12, 2011 to February 26, 2011 from the Helen Street camera.

The agents immediately notified DEA technicians, who checked the data storage unit and confirmed that it contained all of the recordings from the two cameras, except for the recordings from

January 12 - February 26 period from the Helen Street camera.  To determine what caused the recordings to become unavailable, DEA technicians contacted the video software company and the data storage manufacturer for technical assistance.  A diagnostics program on the data storage unit revealed a bad hard drive where the data had been stored.

On April 14, 2011, a data recovery program was used to retrieve all deleted video footage that had been on the data storage unit.  However, the recovered data included not just the footage from January 12 - February 26 but also footage from pole cameras used in other DEA investigations, comprising hundreds of gigabyte of data.

In addition, the data recovery program intermingled the files from the Helen Street camera with the files from pole cameras from unrelated investigations.  Therefore, when DEA personnel attempted to play the .PIC files that were recovered, the third-party software switched from views from the Helen Street camera to views from cameras used in unrelated investigations.  Recognizing that they needed additional assistance, DEA personnel placed the recovered data on a hard drive and sent it separately to the software vendor, to the Philadelphia Regional Computer Forensics Laboratory, and to the DEA Digital Evidence Laboratory.

45

After examining these files, the software vendor determined that the recovered folder for the Helen Street camera contained not only the files created by that camera but also files generated by cameras from other unrelated investigations.  That is, while the files had been successfully recovered, many of them were restored to the wrong folders and had been renamed during the recovery process.  In addition, while it was possible to extract still photos from the files, these photos could not be sorted automatically (for instance, by date) and would have to be sorted manually, a time-consuming process given the sheer volume of data involved.

The software vendor's finding echoed the conclusions of the DEA Digital Evidence Laboratory, which also found that the restored files could not be used to reconstruct the original video footage.

Lastly, the Philadelphia Regional Computer Forensics Laboratory concluded that the video footage from the January 12 to February 26 period could not be repaired.

At trial, the government intends to call the agents who watched the pole camera recordings from January 12 - February 26, 2011 to testify regarding what they saw on the recordings, as set forth in the reports they prepared when they watched these recordings.  The agents' detailed reports have been produced in

46

discovery to defense counsel.

B.    Legal Argument

1.    The Agents' Testimony Regarding the Pole Camera
Recordings is Admissible Under a Well-Settled
Exception to the Best Evidence Rule

Ortiz argues that the agents' testimony should be precluded
under Federal Rule of Evidence 1002's originality requirement
(also known as the "Best Evidence Rule").

Rule 1002 mandates that "[t]o prove the content of a
writing, recording, or photograph, the original writing,
recording, or photograph is required, except as otherwise
provided in these rules or by Act of Congress." Fed.R.Evid.
1002.[9]  An exception to the originality requirement can be found
in Rule 1004, which permits the admission of a duplicate in lieu
of an original under several circumstances, including when "[a]ll
originals are lost or have been destroyed, unless the proponent
lost or destroyed them in bad faith[.]"  Fed.R.Evid. 1004(1).
Establishing an exception for failure to produce the original, as
provided by Rule 1004, is a preliminary question of law to be
resolved by the Court. Fed.R.Evid. 1008 and 104(a).  See
Remington Arms v. Liberty Mut. Ins., 810 F.Supp. 1420, 1426

---

[9]    Videos, such as the one at issue in this matter,
qualify as "photographs" within the meaning of this rule.  See
Fed.R.Evid. 1001(2) ("'Photographs' include still photographs,
X-ray films, video tapes, and motion pictures.").

(D.Del. 1992); see generally, Stocchi v. Kmart Corp., 1997 WL
611619 (E.D.Pa. 1997).  It is the burden of the proponent of the
evidence to prove that the originals were not lost or destroyed
in bad faith and the proponent may satisfy this burden by
"circumstantial evidence such as evidence of a diligent but
unsuccessful search" for the original.  Stocchi, 1997 WL 611619,
at * 1.

    Here, the agents' testimony should be permitted under Rule
1004.  First, as described above and will be shown more fully at
the evidentiary hearing, the original version of the pole camera
recordings from January 12 to February 26, 2011 are "lost"
withing the meaning of Rule 1002.  In other words, while some or
all of the underlying files for those videos were retrieved, due
in large part to the diligence exhibited by DEA technicians,
those files cannot be played to reconstruct the original video.
This is not just the DEA technicians' conclusions, it is also an
assessment shared by the third-party software vendor, the DEA
Digital Evidence Laboratory, and the Philadelphia Regional
Computer Forensics Laboratory.

    Second, there is not even a hint of bad faith[10] associated

_____

    [10]   Failing to offer a theory of how the government's
actions could conceivably constitute bad faith, Ortiz, citing no
authority, instead asks the Court to "presume" that the
government acted in bad faith.  Def's Br. at p. 21.  As shown
above, there is neither a factual nor a legal basis for inferring

with the loss of the original pole camera recordings.  Those
recordings were lost due to an unanticipated software or hardware
error, not as a result of any intentional conduct by the agents
or DEA personnel.  Indeed, upon learning that the video
recordings were missing, DEA personnel did not just sit on their
hands.  Rather, they promptly attempted to learn why the files
were missing, attempted to retrieve them, and, failing that,
sought technical assistance not just from the vendor, but also
from two other digital laboratories to try to recover the
recordings.  Even though Rule 1004 does not impose a diligence
requirement, the government here can easily establish that it
made a diligent, though unsuccessful, inquiry for the missing
material.  United States v. McGaughey, 977 F.2d 1067, 1071 (7th
Cir. 1992) ("Rule 1004 does not contain an independent
requirement that a search be conducted; rather, the concept of a
diligent search is an avenue by which the larger issue of the
document's destruction may be proved.")

     Indeed in United States v. Brown, 2009 WL 2338112 (W.D.Pa.
Jul. 29, 2009), the court rejected the defendant's attempt to
keep agents from testifying about the contents of a videotape
that was mistakenly deleted even though, in that matter, the
court found that the government had failed to take any steps "to

_____

bad faith and the proposed testimony should be permitted.

determine forensically how the video tape was destroyed."  <u>Id</u>. at *1.  The facts here, by contrast, provide an even more forceful basis for allowing the testimony in light of the government's swift and diligent response.

Lastly, since the original pole camera recordings were lost without any bad faith by the government, the government should be permitted, under Rule 1004, to present the testimony of the agents based on their notes and reports from reviewing the videos.  <u>See United States v. Ross</u>, 33 F.3d 1507, 1513 (11th Cir.1994) (asserting that "[o]nce the terms of Rule 1004 are satisfied, the party seeking to prove the contents of the recording—here, the government—may do so by any kind of secondary evidence"); <u>United States v. Gerhart</u>, 538 F.2d 807, 809 (8th Cir.1976)(holding that secondary evidence presented under Rule 1004 can be in any form); <u>Remington Arms</u>, 810 F.Supp. at 1427 (same).

While Ortiz takes issue with the reliability of the agents' proposed testimony, such complaints go to weight of the testimony, which is a question for the trier of fact, and not to its admissibility.  <u>See United States v. Gerhart</u>, 538 F.2d at 809 n. 2; <u>Remington Arms Co.</u>, 810 F.Supp. at 1422-23.

2.    The Proposed Testimony is Admissible Under
      Rule 403 Because its Probative Value is not
      Substantially Outweighed by the Danger of
      Unfair Prejudice

Ortiz also cannot establish that the agents' testimony is
inadmissible under Rule 403.  Rule 403 does not offer protection
against evidence that is merely prejudicial, in the sense of
being detrimental to a party's case.  Rather, the rule only
protects against evidence that is unfairly prejudicial. Evidence
is unfairly prejudicial only if it has "an undue tendency to
suggest decision on an improper basis, commonly, though not
necessarily, an emotional one." Carter v. Hewitt, 617 F.2d 961,
972 (3d Cir. 1980). "The prejudice resulting to defendants from
the fact that introduction of the evidence was damaging to their
case is, of course, not the kind of prejudice against which
Fed.R.Evid. 403 protects defendants."  United States v. DeLillo,
620 F.2d 939, 947 n.2 (2d Cir. 1980). "Virtually all evidence is
prejudicial or it is not material." Carter, 617 F.2d at 972 n.14
(citations omitted.

Moreover, evidence cannot be excluded under Rule 403 merely
because its unfairly prejudicial effect is greater than its
probative value.  Instead, it can be kept out only where the
danger of unfair prejudice "substantially outweigh[s]" its
probative value.  Fed.R.Evid. 403.  Thus, exclusion of evidence

51

is an "extraordinary" remedy that should be applied sparingly; the balance should be struck in favor of admissibility.  United States v. Terzado-Madruga, 897 F.2d 1099, 1117 (11th Cir. 1990). As the Third Circuit, sitting en banc, was at pains to emphasize, "[Rule 403] creates a presumption of admissibility.  United States v. Universal Rehabilitation Serv. (PA), Inc., 205 F.3d 657, 664 (3d Cir.2000) (en banc) (citations omitted).  In short, "if there is doubt about the existence of unfair prejudice ... it is generally better practice to admit the evidence, taking necessary precautions by way of contemporaneous instructions to the jury followed by additional admonitions in the charge." Id. at 665 (citations and internal quotations omitted).

     Here, the Court should permit the agents' testimony because the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.  First, the evidence is probative.  The missing video footage, among other things, shows the defendant's Blue Pickup backing into the warehouse through the entrance on Helen Street on several occasions.  For instance, on January 28, 2011, according to the pole camera recordings, the defendant's Blue Pickup reversed into the warehouse with the bed of the truck exposed.  Special Agent Gimbel, reviewing these recordings, recognized the defendant and saw him wearing a light-colored, waist-length jacket.  The

defendant then backed out of the warehouse a few minutes later, with the bed of the truck concealed.  This evidence, among other things, will corroborate the expected testimony of cooperating witnesses – testimony that the defendant will undoubtedly hotly contest – that the defendant, using at least two different pickup trucks, came to the warehouse on several occasions in January 2011 to deliver cocaine to the DTG and pick up cocaine proceeds from DTG members.  The agents' proposed testimony possesses ample indicia of factual reliability because it will be drawn from their contemporaneous notes, later reduced to reports, of their observations of the lost video recordings before they had any reason to believe that those recordings would be lost due to a software or hardware error.

Whereas the probative value of the evidence is high, the danger of unfair prejudice flowing from its admission is low. Ortiz's main claim of unfair prejudice is that, without the benefit of the video, his counsel will have no real opportunity to cross-examine the agents.  His concerns are overstated. Defense counsel, of course, will have the opportunity at trial to cross-examine the agents on the basis of their reports and notes and to attack the accuracy of the agents' observations.  While the video recordings may have assisted defense counsel in conducting this cross-examination, defense counsel is not left

powerless, as he believes, to engage in a searching cross-examination.  Thanks to the availability of the reports that he received in discovery over five months ago and that constitute the agents' present sense impressions and could be used to refresh their recollections, defense counsel can bring out the limitations of the agents observations during cross-examination. Likewise, defense counsel is free at trial to argue to the jury about the proper weight it should give to this testimony, based on what he elicited on cross-examination.  In the end, this is no different from the common scenario where agents testify about their visual surveillance and defense counsel uses the agents' reports to attack the agents' testimony about their surveillance. Cf. United States v. Howard, 953 F.2d 610, 613 (11th Cir. 1992) (per curiam) (suggesting that availability of monitoring agent at trial furthers purpose of best evidence rule to prevent fraud in proving contents of recordings because defendant may cross-examine agent's abilities and actions).

In claiming that this Court should not permit the agents' testimony, defendant points to the decision in United States v. Brown, 2009 WL 2338112 (W.D.Pa. Jul. 29, 2009), where the Court precluded the government from offering testimony about a video that had been destroyed.  Brown is completely distinguishable and is of no help to him.

In **Brown**, the court held that the agents' proposed testimony about the contents of a destroyed video would unfairly prejudice the defendant in three critical respects, none of which exists here.  First, the agents planned to testify about the video though they had only viewed it once, over three years before, and without any contemporaneous notes, reports, or any other written account of what they saw.  Against this backdrop, the court thought defense counsel would be severely handicapped in trying "to cross-examine these witnesses as to the accuracy of their recollection given that counsel has not viewed the video and does not have any other objective account of the content of the tape with which to compare."  Id. at *2.  In contrast to **Brown**, defense counsel here has the agents' reports - brimming with times, names and descriptions of the visitors to the warehouse, license plate numbers of vehicles, among other things – which the defense could use to try to undercut the agents' testimony on cross-examination.

Second, the court deemed the proposed testimony cumulative (and necessarily of minimal probative value) in light of the other substantial evidence – including an audio recording – at the government's disposal concerning the controlled drug buy depicted in the corrupted tape.  Id.  Here, far from merely duplicating other evidence, the proposed testimony rather

supplements and corroborates other evidence that the government will present about the unlawful activities.

Third, the court feared that the jury might believe that the agents "were eyewitnesses to the alleged crime, as opposed to merely being present when the video tape was viewed." Id. at *2. But there is little risk of a similar misapprehension by the jury in this case since the government (and undoubtedly the defense) will elicit testimony that the observations came from viewing the lost footage and not live surveillance.  In any event, if this Court believes that the jury needs further clarification, it can issue a limiting instruction to eliminate any unfair prejudice. See United States v. Saada, 212 F.3d 210, 224 (3d Cir. 2000) (proper limiting instructions presumptively mitigate the risk of any unfair prejudice); see also Fed. R. Evid. 403 advisory committee note 33 ("In reaching a decision whether to exclude on grounds of unfair prejudice, consideration should be given to the effectiveness or lack of effectiveness of a limiting instruction.").[11]

---

[11]     Another distinction between this matter and Brown is that here the government took swift action to determine why the pole camera recordings were missing and to try restore them, whereas in Brown, according to the court, the government did not exhibit similar diligence. Id. at * 1.  While the Court may have precluded the evidence there in part because of this lack of diligence, it would be unfair to penalize the government here by excluding otherwise admissible evidence in the face of the prompt, diligence response the government took in this case.

3.   <u>The Proposed Testimony Comports with Due Process</u>

Next, Ortiz says that the proposed testimony about the pole camera recordings violates his due process rights.  Because the government did not act in bad faith, this alternative basis for suppression should also be rejected.

For a defendant to show that the government's loss of evidence violates his due process right, he has the burden of proving that the government acted in bad faith.  <u>Arizona v. Youngblood</u>, 488 U. S. 51, 58 (1988); <u>see also United States v. Deaner</u>, 1 F.3d 192, 200 (3d Cir. 1993) ("A defendant who claims destroyed evidence might have proved exculpatory if it could have been subjected to tests has to show the prosecution's bad faith in ordering or permitting its destruction.  Without a showing of bad faith, failure to preserve evidence that might be of use to a criminal defendant after testing is not a denial of due process.").

To make out the required showing of bad faith, a defendant must demonstrate that the government intentionally acted to gain some tactical advantage over the defendant or to harass him.  <u>Youngblood</u>, 488 U. S. at 57, discussing <u>United States v. Marion</u>, 404 U. S.307 (1971).  Alternatively, bad faith could be shown by official animus toward the defendant or a conscious effort to suppress exculpatory evidence.  <u>California v. Trombetta</u>, 467 U.

57

S.479, 488 (1984).  Here, for the reasons already shown above,
there was no bad faith, and the defendant cannot present any
evidence to the contrary.  To put it plainly, Ortiz cannot prove
that any of the agents involved had "animus or [made] a conscious
effort to suppress exculpatory evidence." <u>Jones</u>, 965 F.2d at 477
(quotation marks omitted).  And on top of all that, the
recordings – which show the defendant going to and leaving from a
the DTG's drug distribution headquarters – cannot be
characterized as exculpatory.

Recognizing that his failure to establish bad faith conduct
by the government defeats his due process claim, Ortiz puts a
different spin on this argument by asserting that, even in the
absence of bad faith, due process dictates that this Court bar
the agents from telling the jury that he was the person who they
saw on these video recordings driving into the warehouse, as
described in the report.  Ortiz complains that such opinion
testimony improperly usurps the jury's role as fact finder
because the agents would be directing the jury to find that the
defendant was the person depicted in the videos.

This argument is without merit.  Despite putting a
constitutional gloss to this argument, Ortiz, at bottom, is
seeking to preclude testimony under Rule 701.  Rule 701 allows a
lay witness to offer opinion testimony that is "(a) rationally

based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701.  The "modern trend favors admissibility of opinion testimony." Gov't of the V.I. v. Knight, 989 F.2d 619, 630 (3d Cir. 1993) (citations and internal quotations omitted).

Here, the agents' testimony identifying Ortiz is rationally based on their perceptions of viewing the video and their knowledge about Ortiz, based on their visual surveillance of Ortiz and their familiarity with Ortiz's identity from viewing his driver's license photo.  In addition, this testimony is helpful to the jury, since the agents had been conducting the investigation for months and were familiar with the DTG's activities.  Notably, in United States v. White, 639 F.3d 331 (7th Cir. 2011), which the defendant cites in support of exclusion, the Court rejected the very argument, explaining that the jury was free to disbelieve the testimony that the defendant was the same person who was in the surveillance photo.  Id. at 335 -336.

In short, nothing about this testimony touches on the defendant's due process rights and his argument should thus be rejected.

59

**4.   The Proposed Testimony is not Barred by the Doctrine of Spoliation Because the Government did not Act in Bad Faith**

Next, Ortiz seeks suppression of the agents' testimony because he contends that the government spoiled the pole camera recordings.  His argument for suppression falls short.

Spoliation of evidence constitutes the intentional destruction of evidence by an affected party.  United States v. Copeland, 321 F.3d 582, 597 (6th Cir. 2003).  When determining the proper sanction for spoliation – dismissal of claims, suppression of evidence, etc. – courts must consider the following factors:

(1) the degree of fault of the party who altered or destroyed the evidence;

(2) the degree of prejudice suffered by the opposing party; and

(3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994).

Here, because there is no evidence of bad faith or intentional conduct by the government, suppression of the evidence based on a spoliation theory is unwarranted.  Fundamentally, Ortiz cannot show that the government "intended to

60

impair the ability of the other side to effectively litigate its case." <u>United States v. Bunty</u>, 617 F. Supp. 2d 359, 370 (E.D.Pa. 2008) (citations and internal quotations omitted).  <u>See also United States v. Pitts</u>, 2011 WL 5142682 (E.D.Pa. Oct. 31, 2011) (rejecting claim for spoilation instruction where defendant "has pointed to no evidence of bad faith conduct by the government").

Even in <u>Bunty</u>, the defendant's lead authority for his spoilation theory, the Court expressly rebuffed the defendant's spoilation theory because he could not establish that the government agents acted in bad faith. 617 F.Supp.2d at 370.

Accordingly, this Court should also deny the motion to preclude for the foregoing reasons.

> 5. The Ninth Circuit's Decision in <u>Loud Hawk</u> Offers no Cognizable Basis for Precluding the Testimony

On the strength of the decision in <u>United States v. Loud Hawk</u>, 628 F.2d 1139 (9th Cir. 1979), Ortiz seeks preclusion of the agents' testimony regarding the pole camera recordings.  This argument is little more than a repackaged version of the defendant's other arguments for precluding the testimony and, like the others, must be rejected.

<u>Loud Hawk</u> recognizes that a defendant bears the burden of showing both bad faith and prejudice before obtaining the requested relief.  <u>See Loud Hawk</u>, 628 F.2d at 1146 ("When the

government loses or destroys tangible evidence prior to trial, a motion to suppress secondary evidence... will be granted... if the defendant can show (1) bad faith... and (2) that he was prejudiced"). In this context, bad faith "requires some showing of connivance." <u>Id.</u>

Even assuming that the Ninth Circuit decision in <u>Loud Hawk</u>, which has never been adopted by the Third Circuit, should be embraced by this Court, that case cannot support suppression of the testimony because Ortiz cannot establish that DEA personnel destroyed potentially exculpatory evidence in bad faith.

**IV. RESPONSE TO DEFENDANT'S MOTION TO PRECLUDE IN-COURT VIDEO IDENTIFICATION**

In this Motion, Ortiz requests an order barring the government from offering testimony identifying him as the person shown inside of a pickup truck on a pole camera recording. The Motion should be denied.

The recording, from January 24, 2011, at around 8:30 p.m., shows the defendant's vehicle drive to the front of the warehouse. (This recording was taken by the Jasper Street camera and was not among the recordings that were lost. The defendant has been provided a copy of this recording.) Shortly after the truck arrived at the warehouse, Nelson Rodriguez walked out of the warehouse carrying a large dark trash bag that he placed in the rear passenger side of the truck, and the truck drove off.

Ortiz's motion appears to be prompted by his concern that the government will show the video recording, or a still photograph from the recording, and have an agent testify solely from the testimony that Ortiz was in the vehicle. His concerns are misplaced.

To establish that Ortiz was in the pickup truck at that time, the government will offer, among other things, testimony from agents who followed him to and from the warehouse. These agents surveilled Ortiz and that truck all day on January 24,

63

2011, and followed him as he entered the truck, accompanied by two passengers, and kept sight of him as he drove directly from a casino to the warehouse to meet with Rodriguez.  And after meeting with Rodriguez, agents kept sight of the truck and saw it as it parked on the block where Ortiz lives and saw Ortiz and the other two men get out of the truck.  Such testimony is relevant, probative, and plainly permitted under Rule 701.  Ortiz's motion should therefore be denied.

**V.  RESPONSE TO DEFENDANT'S MOTION FOR DISCLOSURE OF CORRLINKS E-MAILS**

Ortiz's next motion, styled as a "Motion for Disclosure of Corrlinks E-Mails," is a motion for a Rule 17(c) subpoena for "copies of any and all email correspondences from the[] following inmates['] records: Miguel Rosado Ortiz, 08621-069; Angel Aponte Ayala, 61856-066; Nelson Rodriguez, 61858-066; Nelson Rodriguez, 61861-066[,] includ[ing] . . . all Corrlinks[12] records composed by and received [by] these inmates during their incarceration." See Def't Mot., Ex. A.  This motion should be denied.

The defendant's requested subpoena is impermissible and in contravention of Rules 17 of the Federal Rules of Criminal Procedure.  In United States v. Nixon, the Supreme Court held that in order to require production prior to trial, Rule 17 requires that: (1) that the documents are evidentiary and

---

[12]  The Federal Bureau of Prisons has created "a new program . . . to provide inmates with some limited computer access, to include the capability to send and receive electronic messages without having access to the Internet. This program is designed in part to assist in the inmate's eventual release to the community. Electronic messaging has now become a standard form of communication within most American homes and businesses, and it can now be used to help inmates stay connected to their families. Strengthening or re-establishing family ties helps inmates improve the likelihood of a successful re-entry into the community, thus reducing the potential for recidivism."  See http://www.bop.gov/inmate _programs/trulincs_faq.jsp.  The program is called the Trust Fund Limited Inmate Computer System (TRULINCS), and is run through CorrLinks, a Web based electronic mail service (http://www.corrlinks.com) provided by Advanced Technologies Group, Inc.  See id.; https://www.corrlinks.com.

relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend to unreasonably delay the trial; and (4) that the application is made in good faith and not intended as a "fishing expedition."  418 U.S. 683, 699-700 (1976).  Relevance, admissibility and specificity are threshold questions that the Court must consider when considering enforcement of Rule 17 subpoenas.  Id.

Evidence which is not relevant is inadmissible.  Fed. R. Evid. 402.  In order to be relevant it must be probative of the proposition it is offered to prove.  Fed. R. Evid. 401.  Here, defendant has provided no indication, specific or otherwise, of why any emails sent to or from three of his charged co-conspirators during their incarceration in the Federal Bureau of Prisons would be relevant to his participation in the charged cocaine trafficking conspiracy — in fact, the defendant has not even provided a basis for requesting his own emails, which are covered by the requested subpoena but which the Bureau of Prisons has informed the government do not exist.[13]  Without any offer of

_____

[13]     Darrin Howard, Esq., Attorney Advisor for the Bureau of Prisons at the Federal Detention Center, has informed the government that the defendant has not sent any emails over the

proof as to how these emails might be relevant or discoverable, the government suspects that the instant request is nothing more than a fishing expedition that hopes to generate some sort of evidence.

Ortiz also has not provided any indication as to how the content of any of the requested emails can be introduced into evidence in his case in chief.  As this Court noted in an unpublished decision, "Rule 17(c) was not intended to be a broad discovery device, and only materials that are 'admissible as evidence' are subject to subpoena under the rule."  See United States v. Henry, 2007 WL 219885 (E.D.Pa. Jan. 26, 2007) (unpublished decision) (citing in part United States v. Dent, 149 F.3d 180, 191 (3d Cir.1998) and Bowman Dairy Co. v. United States, 341 U.S. 214, 220 (1951) ("Rule 17(c) was not intended to provide an additional means of discovery.  Its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials.")  As the Third Circuit cautioned in United States v. Cuthbertson,

---

Bureau's email system, but that the other three co-defendants whose emails have been requested do have emails on the system. The approximate total volume of emails is 1,500 emails.  Mr. Howard also informed government counsel that the Bureau's email system may not be capable of excluding email to and from defense counsel (unlike the Bureau's inmate telephone system, which may be manipulated to search for and exclude specific phone numbers).

"[c]ourts must be careful that rule 17(c) is not turned into a broad discovery device, thereby undercutting the strict limitation of discovery in criminal cases found in Fed.R.Crim.P. 16."  651 F.2d 189, 146 (3d Cir.1981). "Courts have consistently interpreted the admissibility standard of Rule 17(c) to preclude production of materials whose evidentiary use is limited to impeachment." <u>United States. v. Cherry</u>, 876 F.Supp. 547, 553 (S.D.N.Y.1995) (citations omitted); <u>see also United States v. Merlino</u>, 349 F. 3d 144, 155 ( 3d Cir. 2003) ("As for the District Court's rejection of the 17(c) subpoena, defendants acknowledge that impeachment material is generally not subject to pre-trial disclosure under the Rule.")  As Ortiz offers no basis for his requested subpoena, it is difficult to discern any motive to collect the emails other than impeachment.[14]

The facts of this case are wholly distinguishable from <u>United States v. Tucker</u>, 249 F.R.D. 58 (S.D.N.Y. 2008).  In that case, the district court, in what it acknowledged was a novel decision opposed by the government, declined to extend the <u>Nixon</u> requirements to a defense subpoena of the Bureau of Prisons that

---

[14]     The government has not itself subpoenaed the requested emails.  Although not specifically on point in this cause of action, the Third Circuit has found that the Bureau of Prisons is not a part of the prosecutorial arm of the Federal government. As such, the government has no duty to turn over prison emails under the Jencks Act.  <u>United States v. Merlino</u>, 349 F.3d 144, (3rd Cir. 2003).

requested all recorded phone calls of named cooperating witnesses.  Although the government respectfully disagrees with the **Tucker** decision, its reasoning was based on several case-specific factors that are not remotely present here: the requested production was made on the eve of trial, requesting phone calls of named government witnesses, in a case where the defendant had an articulable suspicion based on specific evidence that the requested phone calls might be material to the defense. Tucker, 249 F.R.D. at 66.  The defendant in this case has not (and cannot) remotely make a showing similar to that made in **Tucker**.[15]

Further, under Rule 17(c), the Court may quash an "unreasonable and oppressive" subpoena.  In this case, the total volume of emails requested appears to be approximately 1,500 emails.  Authorization of the use of subpoena power in this case and under these circumstances, without the required showing of need, would allow the same use of subpoenas in every case now pending in District Court. This would effectively permit defendants to burden the Federal Bureau of Prisons to provide emails for a purpose that was not intended and contrary to the

---

[15]    In **Tucker**, the court also limited the defendant's subpoena, restricting access to the recorded calls to defense counsel and defense investigators, and forbidding access of the defendant to any materials that could jeopardize the safety of government witnesses.

Federal Rules of Criminal Procedure.

In addition, the government is concerned about the wholesale release of private information about, and private conversations with, charged co-conspirators and their members and friends. The Court had signed a protective order in this case because of possible release of information about potential government witnesses. There is always a danger in these types of cases of intimidation of, or threats to, government witnesses through the family or friends of those witnesses. However, in this particular case, specific concerns for the safety of defendants (whether or not they are cooperating) have been brought to the government's attention.

Accordingly, the United States of America respectfully submits that the defendant's motion should be DENIED.[16]

---

[16]    Government counsel has contacted counsel for the three individuals other than the defendant whose emails are the subject of the requested subpoena (Dennis J. Cogan, Esq., Attorney for Nelson Rodriguez; Gerald A. Stein, Esq., Attorney for Nelson Rodriguez-Ortiz; and William J. Murray Jr., Esq., Attorney for Angel Ayala-Aponte). If the Court is inclined to grant the defendant's motion, each counsel has indicated that they may move this Court to quash the subpoena and requests that the Court provide them the opportunity to do so. Darrin Howard, Esq., has also informed government counsel that the Bureau of Prisons may want to move this Court to quash the subpoena made a similar request for an opportunity to do so if the need should arise.

70

**VI.  RESPONSE TO DEFENDANT'S MOTION FOR PRESERVATION AND DISCLOSURE OF AGENTS' ROUGH NOTES**

Ortiz moves for an order requiring that the government preserve all rough notes taken by law enforcement officers who investigated this case.  The government recognizes its obligation to preserve rough notes and will do so. <u>United States v. Vella</u>, 562 F.2d 275 (3d Cir. 1977).  But these notes are preserved only to permit prosecutors and then, if necessary, trial judges to review the notes to assure that no <u>Jencks</u> or <u>Brady</u> material is present in the notes.  If no such material exists in the notes, the notes are not produced to the defense.  <u>United States v. Ramos</u>, 27 F.3d 65, 68 (3d Cir. 1994).

## VII. RESPONSE TO DEFENDANT'S CONDITIONAL MOTION FOR DISCLOSURE OF REPORTS REGARDING DESTROYED EVIDENCE

In response to the defendant's motion for reports relating to loss of the pole camera recordings, the government will provide the defendant with relevant reports.  As a result, this motion should be denied as moot.

VIII.    RESPONSE TO DEFENDANT'S MOTION TO COMPEL DISCOVERY

In this matter, the government has disclosed to the defendant discovery required under the Federal Rules of Criminal Procedure (including reports, video recordings, photographs, to name a few) and invited defense counsel to inspect any narcotics evidence or physical evidence seized in connection with this case.  The government has also continued to provide the defendant with additional discovery, where necessary, on an ongoing basis.

Yet, without even conferring with the government about his request, the defendant has filed a motion asking for additional discovery so that he "may properly evaluate his options and make an informed decision."  Brief at 38.  However, he identifies neither the discovery he is seeking nor the authority supporting his fishing expedition.  There is no merit in this motion and it should be denied.

The government has satisfied its discovery obligations and will continue to do so. This motion should be denied.

IX.  RESPONSE TO DEFENDANT'S MOTION TO PRECLUDE ADMISSION OF
     PRIOR DRUUG CONVICTION

     The defendant has moved to preclude admission of his

prior conviction on July 22, 1994 for possessing with intent

to distribute and aiding and abetting the possession with

intent to distribute 18 kilograms of cocaine.  For the

following reasons, that motion should be DENIED and the

government's motion pursuant to Federal Rule of Evidence

404(b) should be GRANTED.

     Rule 404(b) provides that:

          Evidence of other crimes, wrongs, or acts is not
          admissible to prove the character of a person in
          order to show action in conformity therewith.  It
          may, however, be admissible for other purposes,
          such as proof of motive, opportunity, intent,
          preparation, plan, knowledge, identity, or absence
          of mistake or accident, provided that upon request
          by the accused, the prosecution in a criminal case
          shall provide reasonable notice in advance of
          trial, or during trial if the court excuses
          pretrial notice on good cause shown, of the
          general nature of any such evidence it intends to
          introduce at trial.

Rule 404(b) applies to evidence of wrongful acts which are

"extrinsic" to the charged offense.  Evidence which is

"intrinsic" does not fall within the rule.  <u>United States v.</u>

<u>Green</u>, 617 F.3d 233, 245 (3d Cir. 2010).

     "In <u>Huddleston v. United States</u>, 485 U.S. 681 []

74

(1988), the Supreme Court set out a four-part test for admission of Rule 404(b) evidence: (1) the evidence must have a proper purpose; (2) it must be relevant; (3) its probative value must outweigh its potential for unfair prejudice; and (4) the court must charge the jury to consider the evidence only for the limited purposes for which it is admitted." United States v. Givan, 320 F.3d 452, 460 (3d Cir. 2003).

The proponent of evidence of prior acts "must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged." United States v. Morley, 199 F.3d 129, 133 (3d Cir. 1999); United States v. Himelwright, 42 F.3d 777, 782 (3d Cir. 1994).[17]Rule 404(b) is a rule of inclusion rather than exclusion, and the purposes for which such evidence may be offered are not limited to those listed in the rule.  See,

---

[17]   "The parameters of Rule 404(b) are not set by the defense's theory of the case; they are set by the material issues and facts the government must prove to obtain a conviction." United States v. Sampson, 980 F.2d 883, 888 (3d Cir. 1992). Indeed, the government, at the time it presents its case-in-chief, often does not know precisely what defense will be offered or even if the defendant will present any case at all.  United States v. Ferrer-Cruz, 899 F.2d at 139.

e.g., <u>United States v. Jemal</u>, 26 F.3d 1267, 1272 (3d Cir. 1994); <u>United States v. Scarfo</u>, 850 F.2d 1015, 1019 (3d Cir. 1988).

The Third Circuit's decision in <u>Green</u> expansively affirms the inclusionary nature of the rule. <u>Green</u> presented a lengthy discussion of the historical underpinnings of Rule 404(b), explaining that the common law set forth a general rule of inadmissibility of evidence of uncharged bad acts, subject to limited exceptions, while the Federal Rules of Evidence changed this approach, setting forth "a general rule of admissibility, subject to a single exception - evidence of other wrongful acts was admissible so long as it was not introduced *solely* to prove criminal propensity. Thus, the proponent no longer had to pigeonhole his evidence into one of the established common-law exceptions, on pain of exclusion. If he could identify *any* non-propensity purpose for introducing the evidence, it was admissible." <u>Green</u>, 2010 WL 3081444 at *9 (emphasis in original).

The Third Circuit has spoken favorably of Rule 404(b) evidence on many occasions. For instance, another panel

76

wrote about Rule 404(b):

> We favor the admission of such evidence, "if relevant
> for any other purpose than to show a mere propensity or
> disposition on the part of the defendant to commit the
> crime." United States v. Long, 574 F.2d 761, 766 (3d
> Cir.), cert. denied, 439 U.S. 985, 99 S.Ct. 577, 58
> L.Ed.2d 657 (1978); see also United States v. Simmons,
> 679 F.2d 1042, 1050 (3d Cir.1982), cert. denied, 462
> U.S. 1134, 103 S.Ct. 3117, 77 L.Ed.2d 1370 (1983)
> . . . . "In weighing the probative value of evidence
> against the dangers . . . in Rule 403, the general rule
> is that the balance should be struck in favor of
> admission." United States v. Dennis, 625 F.2d 782, 797
> (8th Cir.1980).

United States v. Johnson, 199 F.3d 123, 128 (3d Cir. 1999).

See also United States v. Daraio, 445 F.3d 253, 263 (3d Cir.

2006) (confirming that admission of 404(b) evidence is

favored).  The Court has particularly stated that "the

Government has broad latitude to use 'other acts' evidence

to prove a conspiracy." United States v. Cross, 308 F.3d

308, 324 (3d Cir. 2002).

"Trial court rulings under Rule 404(b) are reviewed for

an abuse of discretion and may be reversed only when they

are 'clearly contrary to reason and not justified by the

evidence.'" United States v. Balter, 91 F.3d 427, 437 (3d

Cir. 1996) (quoting United States v. Bethancourt, 65 F.3d

1074, 1079 (3d Cir. 1995)).  Similarly, a district court's

ruling under Rule 403 may be reversed only if it is
"arbitrary or irrational."  <u>United States v. Universal
Rehabilitation Services (PA), Inc.</u>, 205 F.3d 657, 665 (3d
Cir. 2000) (en banc) (quoting <u>In re Paoli R.R. Yard PCB
Litig.</u>, 113 F.3d 444, 453 (3d Cir. 1997)).  "If judicial
self-restraint is ever desirable, it is when a [Federal]
Rule 403 analysis of a trial court is reviewed by an
appellate tribunal."  <u>Universal Rehabilitation Services</u>, 205
F.3d at 665.

        "There is no question that, given a proper purpose and
reasoning, drug convictions are admissible in a trial where
the defendant is charged with a drug offense."  <u>United
States v. Sampson</u>, 980 F.2d 883, 887 (3d Cir. 1992)
(collecting cases).  The Third Circuit has reiterated that
evidence of prior narcotics convictions is admissible under
Rule 404(b) to show plan, knowledge, intent, and absence of
mistake or accident.  <u>United States v. Boone</u>, 279 F.3d 163
(3d Cir. 2002), addressed perhaps the most typical situation
in which 404(b) evidence is offered in a drug case – where a
carrier of drugs claims that he did not know what was in the
package he carried, and the government seeks to offer proof

of prior drug dealing by that defendant to prove his knowledge, intent, and absence of mistake.  The Court held that the evidence was offered for a proper purpose and not to show mere propensity to commit a crime.  "The government correctly responds that evidence of one's familiarity with the subterfuge and concealment inherent in drug-trafficking was relevant to the issue of whether Boone may have believed the bag contained contraband other than cocaine."  Id. at 187.  See also United States v. Lee, 573 F.3d 155, 166 (3d Cir. 2009) (evidence of a prior drug conviction was admissible to prove the defendant's intent to distribute drugs in his possession); United States v. Givan, 320 F.3d 452, 460-61 (3d Cir. 2003) (six-year-old drug distribution conviction was properly admitted to show knowledge and intent of defendant who was found in a car with heroin hidden under his seat); United States v. Vega, 285 F.3d 256, 261 (3d Cir. 2002) (evidence of involvement in prior drug conspiracy was admissible to prove defendant's knowledge of later conspiracy and his relationship with a co-conspirator).[18]

---

[18]    Other circuits are in agreement that evidence of prior narcotics convictions is admissible under Rule 404(b) to show

The court is also required by Rule 403 to assure that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.  This is not a simple "balancing."  The rule makes clear that exclusion is allowed only if the prejudicial impact "substantially outweighs" the probative value.  In part, this means that the test is almost surely not met where the probative value of the evidence is itself high.  The remedy is "extraordinary," and should be applied sparingly; the balance should be struck in favor of admissibility.  <u>United States v. Terzado-Madruga</u>, 897 F.2d 1099, 1117 (11th Cir.

_____

knowledge, intent, and absence of mistake or accident.  <u>See</u>, <u>e.g.</u>, <u>United States v. Howell</u>, 231 F.3d 615, 628-29 (9th Cir. 2000) (admitting evidence of previous narcotics convictions to rebut claimed innocent motive for being present where drugs were found); <u>United States v. Wash</u>, 231 F.3d 366, 369-71 (7th Cir. 2000) (prior possession of crack cocaine admissible to prove knowledge and intent to distribute); <u>United States v. Hardy</u>, 224 F.3d 752, 756-57 (8th Cir. 2000) (prior drug possession admissible to show intent to distribute); <u>United States v. Hill</u>, 60 F.3d 672, 676 (10th Cir. 1995) (proper to admit testimony that accused in drug case possessed cocaine base during two prior arrests); <u>United States v. Clarke</u>, 24 F.3d 257, 264-65 (D.C. Cir. 1994) (evidence of prior drug transactions allowed to show intent); <u>United States v. Clemis</u>, 11 F.3d 597 (6th Cir. 1994) (evidence of defendant's participation in an earlier, uncharged drug transaction was properly admitted to show defendant's intent in later, charged offense); <u>United States v. Pitre,</u> 960 F.2d 1112, 1117 (2d Cir. 1992) (evidence of prior narcotics transactions was properly admitted 'to show that [the defendants] were not there just to be standing there on the night of their arrests').

1990); <u>accord</u>, <u>United States v. Dennis</u>, 625 F.2d 782, 797

(8th Cir. 1980); <u>United States v. Day</u>, 591 F.2d 861, 878

(D.C. Cir. 1978).

Second, "prejudice" does not mean simply that the

evidence is harmful to the defendant's case.  Rule 403

> does not offer protection against evidence that is
> merely prejudicial, in the sense of being
> detrimental to a party's case.  Rather, the rule
> only protects against evidence that is <u>unfairly</u>
> prejudicial.  Evidence is unfairly prejudicial
> only if it has "an undue tendency to suggest
> decision on an improper basis, commonly, though
> not necessarily, an emotional one."  Advisory
> Committee's Note, F.R.E. 403.

<u>Carter v. Hewitt</u>, 617 F.2d 961, 972 (3d Cir. 1980) (emphasis

in original).  "[T]he prejudice against which [Rule 403]

guards is *unfair* prejudice -- prejudice of the sort which

clouds impartial scrutiny and reasoned evaluation of the

facts, which inhibits neutral application of principles of

law to the facts as found.'"  <u>United States v. Starnes</u>, 583

F.3d 196, 215 (3d Cir. 2009) (quoting <u>Goodman v. Pa. Tpk.</u>

<u>Comm'n</u>, 293 F.3d 655, 670 (3d Cir. 2002)).  "Virtually all

evidence is prejudicial or it is not material."  <u>Carter</u>, 617

F.2d at 972 n.14 (quoting <u>Dollar v. Long Manufacturing Co.</u>,

561 F.2d 613, 618 (5th Cir. 1977)).

81

Third, the Third Circuit has often concluded that an appropriate jury instruction eliminates the chance of unfair prejudice, and that juries are presumed to follow such instructions.  See, e.g., United States v. Lee, 612 F.3d 170, 191 (3d Cir. 2010); Givan, 320 F.3d at 462.

Finally, the Third Circuit has allowed the admission under Rule 404(b) even of information which in all likelihood was far more prejudicial than that involved in the current case at issue.  For example, in Green, the defendant was charged with attempted possession of a kilogram of cocaine with intent to distribute.  The Court held that a district court did not abuse its discretion in admitting evidence regarding the defendant's efforts to acquire dynamite in order to kill an undercover officer involved in an earlier case, because the evidence helped explain the conversations between the defendant and a cooperator, and to explain the cooperator's motives in assisting law enforcement.  The Court added:  "We note that we have rejected Rule 403 challenges to the admission of evidence that was just as prejudicial as the evidence at issue here.  See, e.g., Scarfo, 850 F.2d at 1020 (evidence

82

of uncharged murders); <u>United States v. Sriyuth</u>, 98 F.3d 739, 748 (3d Cir.1996) (evidence of uncharged rape)." <u>Green</u>, 2010 WL 3081444 at *11.  <u>See also</u> <u>Bronshtein v. Horn</u>, 404 F.3d 700, 730-31 (3d Cir. 2005) (under a state rule akin to Fed. R. Evid. 404(b), the trial court permissibly allowed evidence of participation in another murder to prove the identity of the killer in the charged murder); <u>United States v. Daraio</u>, 445 F.3d 253, 264-66 (3d Cir. 2006) (evidence of defendant's uncharged tax evasion was relevant to show defendant's intent in failing to pay over payroll taxes).

Examined under these legal standards, the following evidence is admissible for the following reasons:  The defendant's July 22, 1994 conviction in the United States District Court for the District of Puerto Rico of the felony offense of possessing with intent to distribute cocaine and aiding and abetting, arising out of an offense that took place on July 16, 1993. This evidence is relevant to prove the defendant's plan, knowledge and intent to commit the charged crimes and his absence of mistake or accident in committing them.  Additionally, it is relevant to show his opportunity to obtain kilogram quantities of cocaine.  The

government expects the evidence at trial to demonstrate that the defendant was the supplier of a large-scale cocaine conspiracy operating in Philadelphia, PA.  On multiple occasions, the defendant multiple kilograms of cocaine to co-defendant Nelson Rodriguez, who in turn distributed the kilograms of cocaine to customers in Philadelphia.

The facts underlying the defendant's 1994 conviction are that on July 16, 1993, the defendant possessed with intent to distribute and aided and abetted the possession with intent to distribute 18 kilograms (gross weight) of cocaine.[19]

The prior bad act evidence the government seeks to admit is highly probative of the defendant's plan, knowledge and intent to commit the charged crimes, and his absence of

---

[19]   On April 23, 2004, the defendant's supervised release for this conviction was transferred to the Eastern District of Pennsylvania from the District of Puerto Rico; as part of the transfer, some of the District of Puerto Rico court record was sent to the Clerk of Courts for the Eastern District of Pennsylvania.  Although to date the government has obtained certified copies of the defendant's indictment, docket report and judgment and conviction, the government is still seeking to obtain additional court records and information about the offense underlying this conviction.  The government will provide to the defendant and the Court additional information about the facts and circumstances of this offense upon receipt of such information.

mistake or accident in committing the charged crimes i.e.,
that the cocaine distributed by Nelson Rodriguez was
supplied by someone else.  The prior conviction shows his
familiarity and knowledge of the distribution of a
significant kilogram-quantities of cocaine.  Nor is the
proffered evidence any more prejudicial or inflammatory to
the defendant than the crime that is the subject of this
trial; to the contrary, the charged crime and the prior bad
act involve substantially similar conduct.

    For example, in United States v. Coleman, 68 Fed. Appx.
300 (3d Cir. 2003) (not precedential), a prosecution for
narcotics and firearms offenses, the Third Circuit held that
the trial court properly admitted testimony that the
defendant had previously possessed a shotgun similar in
appearance to the one for which he was now charged, and had
purchased plastic bags with red apples on them similar to
those found by police in the case in which he was now
charged, as this evidence was relevant to show that
defendant had knowledge of, and thus possessed, the shotgun
and narcotics seized by police from the apartment where he
lived with another person.  See also United States v. Lee,

85

573 F.3d 155, 166-67 (3d Cir. 2009) (prior drug conviction
properly admitted to prove intent in charged drug crime);
<u>United States v. Zolicoffer</u>, 869 F.2d 771, 773 (3d Cir.1989)
(prior drug transactions admitted to show defendant had
access to drugs); <u>United States v. Echeverri</u>, 854 F.2d 638,
644 (3d Cir. 1988) (access to large quantities of cocaine
probative of preparation to establish "large scale drug
business."). Moreover, in <u>United States v. Cassell</u>, 292
F.3d 788 (D.C. Cir. 2002), the D.C. Circuit observed that
"We have previously held that 'in cases where a defendant is
charged with unlawful possession of something, evidence that
he possessed the same or similar things at other times is
often quite relevant to his knowledge and intent with regard
to the crime charged.'" <u>United States v. Cassell</u>, 292 F.3d
at 793, citing <u>Huddleston v. United States</u>, 485 U.S. 681,
689 (1988). The Court acknowledged that, "[g]ranted, this
evidence does go to propensity, the character circumstance
forbidden by Rule 404(b)," but then explained that, under
Rule 404(b), "'<u>any</u> purpose for which bad acts evidence is
introduced is a proper purpose so long as the evidence is
not offered <u>solely</u> to prove character.'" <u>Id</u>. at 795

(emphasis in original; citations omitted).

Finally, the government will endeavor to offer evidence of this prior crime efficiently and succinctly, by calling just one law enforcement witness.  The government intends to question this witness on the prior act briefly, so as not to eclipse the evidence of the charged crime.  In sum, the proffered evidence will not be unduly prejudicial, and therefore should be admitted under Rule 404(b).[20]

---

[20]   The government believes that the defendant's July 22, 1994 felony drug conviction should be admitted under Rule 404(b). If the Court does not permit the government to admit such evidence, the government respectfully requests that it if the defendant testifies at trial or presents character witnesses, the government be permitted under Federal Rule of Evidence 609 to impeach him or those witnesses with evidence of this conviction. The defendant was released from confinement for this conviction within the past 10 years (the defendant was sentenced to 120 months imprisonment on this conviction) and the crime for which he was convicted is punishable by a period of imprisonment of more than one year, *i.e.* it is a felony conviction.  Rule 609(a)(1) provides that "evidence that an accused has been convicted [of a felony] shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused."  "[P]ermissible questioning typically is limited to the number of convictions, and the nature, time, and date of each."  United States v. Faulk, 53 Fed.Appx. 644, 2002 WL 31667657 (3d Cir. 2002) (not precedential), citing McCormick on Evidence, § 42 at 167 (5th ed., 1999).  As the Third Circuit has explained, "Rule 609 is premised on 'the common sense proposition that one who has transgressed society's norms by committing a felony is less likely than most to be deterred from lying under oath.' ... Rule 609 evidence is admitted in order to inform the jury about the character of the witnesses whose testimony the jury is asked to believe."  Walden v. Georgia Pacific Corp., 126 F.3d 506, 523 (3d

Furthermore, the government hereby informs the defendant that government witnesses, including cooperating defendants and drug purchasers, who will provide testimony against this defendant at trial, will testify about the length of time that they've known the defendant and their drug distribution and personal histories with the defendant. The majority of this testimony will be about bad acts by the defendant that are intrinsic to the conspiracy – *i.e.* the acts to be described will be direct proof of the charged offenses or in facilitation of those offenses.  Summaries of government witnesses testimony, including the testimony of cooperating defendants, will be provided in Jencks material and in the government trial memorandum.

To the extent that the defendant's relationship with any government witnesses pre-dates the charged conspiracy, evidence of such a relationship is admissible under Rule 404(b), which permits the admission of evidence to show the pertinent background of the offenses, and to establish the relationship among the offenders.  <u>United States v. Butch</u>,

_____

Cir. 1997) (citations omitted). The Court can minimize any potential prejudice to the defendant by instructing the jury that these prior convictions can only be used to evaluate his credibility.

256 F.3d 171 (3d Cir. 2001), reaffirmed the principle, <u>see</u>
<u>United States v. O'Leary</u>, 739 F.2d 135 (3d Cir. 1984), and
<u>United States v. Simmons</u>, 679 F.2d 1042 (3d Cir. 1982),
that, in a conspiracy case, 404(b) evidence may be
introduced "to provide necessary background information, to
show an ongoing relationship between [the defendant and a
co-conspirator], and to help the jury understand the
co-conspirator's role in the scheme."  <u>Id.</u> at 1050.  The
Court in <u>Butch</u> found that, relying on this principle, the
district court had not abused its discretion in admitting
evidence of prior thefts committed jointly by individuals
who later joined in a theft conspiracy.  256 F.3d at
176.[21] <u>See also</u> <u>United States v. Green</u>, 617 F.3d 233, 247 (3d
Cir. 2010) ("allowing the jury to understand the
circumstances surrounding the charged crime – completing the
story – is a proper, non-propensity purpose under Rule
404(b).").[22]

---

[21]     Further, in a footnote, the Court stated that the
district court could have also admitted the evidence of prior
thefts under Rule 404(b) to prove the defendant's intent, given
that he denied intentional participation in the crimes.  <u>Id.</u> at
177 n.5.

[22]     In <u>Green</u>, where the defendant was charged with
attempted possession of a kilogram of cocaine with intent to

Accordingly, for the foregoing reasons, the government respectfully requests that this Court rule that the evidence at issue is admissible under the Federal Rules of Evidence.

---

distribute, the Third Circuit held that a district court did not abuse its discretion in admitting evidence regarding the defendant's efforts to acquire dynamite in order to kill an undercover officer involved in an earlier case.  The efforts to obtain both cocaine and dynamite were discussed in the same recorded conversations, and therefore evidence of the threat to kill "was admissible as background information which completed the story of the crime."  <u>Green</u>, 617 F.3d at 250.

X.   RESPONSE TO DEFENDANT'S REQUEST FOR EARLY DISCLOSURE OF
     JENCKS MATERIALS

Ortiz also requests production of Jencks material before
July 16, 2012, as this Court established in Case Management Order
No. 2.

Rule 16(a)(2) provides that the government is under no
obligation to produce a witness's statements until such time as
the witness completes direct examination (see 18 U.S.C. §
3500(a), Rule 26.2(a)).  To the extent that Ortiz's motion seeks
the early discovery of witness statements, it requests relief
that this Court by law cannot provide.  United States v. Murphy,
569 F.2d 771, 773 (3d Cir. 1978) ("The blunt command of the
statute together with the unequivocal legislative history has led
to unbroken precedent in the Courts of Appeals denying to
district courts the power to compel production of the statements
of government witnesses until the conclusion of direct
examination at the trial.").

The policy of the United States Attorney's Office in this
district generally is to produce Jencks statements in advance of
trial, absent some countervailing need to protect particular
witnesses, in order to afford the defense a full opportunity to
prepare for trial and to avoid delays at trial.  Accordingly, and
recognizing the number of cooperating witnesses who will be

91

called to testify on behalf of the government, the government will provide Jencks Act materials for these witnesses on or before July 16, 2012, as this Court has already directed.

This case involves a substantial amount of cocaine from a source or sources based in Mexico, which is gripped by a violent and merciless drug war.  Not surprisingly, the government has serious safety concerns for potential government witnesses and has information suggesting a potential threat by the defendant directed at another person.  Suffice it to say, the safety concerns in this case are real and serious.  The early production of Jencks materials can potentially lead to disastrous results by revealing to the defendant the identify of the government's witness.  It is unsafe and unfeasible for the government to provide these materials any earlier than the disclosure deadline that this Court has established.

While Ortiz refers to instances where Jencks materials have been provided to counsel in advance of trial, that is of no moment.  As this Court is well aware, it is the government's practice of providing Jencks materials to defense counsel prior to trial.  But the timing of such production has to be made with recognition of any witness/cooperator safety concerns, which as already mentioned, are very present in this case.  In the rare cases where Jencks materials have been provided to defense

92

counsel well in advance of trial, the reason usually is an absence of civilian witness or cooperator testimony, or a last minute continuance of trial.  In this case, the government will likely present a large number of civilian witness and cooperator testimony.  Here, the government cannot risk the safety of its witnesses by revealing its Jencks materials when there is a chance of a last minute trial continuance.

Finally, the government's legal position that there is no authority for compelling the early production of Jencks materials is not in any way meant to indicate an unwillingness on behalf of the government to discuss with Ortiz and Mr. Diamondstein their concerns.  The government has and continues to be willing to do so.

**XI.   RESPONSE TO DEFENDANT'S MOTION FOR BILL OF PARTICULARS**

The defendant has also moved for a written Bill of Particulars pursuant to F.R.Cr.P. 7(f).  He is not entitled to such relief and his motion should therefore be denied.

The purpose of an indictment is to provide the defendant with notice of the charges against him, so that he may prepare a defense and protect himself against a second prosecution for the same offense.  The indictment also assures that an independent grand jury has reviewed the accusation.  United States v. Radowitz, 507 F.2d 109, 112 (3d Cir. 1974).  Because an indictment only serves to provide notice of the charges, it need not provide every detail of the government's evidence.  Rather, an indictment is "a plain, concise and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c).

The conspiracy charge in the second superseding indictment plainly meets this requirement.  It alleges that Ortiz and eight other named persons conspired to distribute 5 kilograms or more of cocaine, 28 grams or more of cocaine base ("crack"), and marijuana.  The indictment describes that the conspiracy began on or about May 2010 and continued to on or about March 30, 2011 in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere.  The manner and means section of the conspiracy count

94

describes Ortiz as a cocaine source of supply for the DTG and identifies one of the vehicles he used to transport drugs or drug proceeds.  Ortiz's unlawful conduct is also described in the overt acts, including his supply of a large quantity of cocaine to Nelson Rodriguez between January 20 and January 28, 2011, and his delivery of in excess of 20 kilograms of cocaine to the DTG warehouse on January 28, 2011, and transportation of over $2.3 million of drug proceeds on the same day.

To assert that this second superseding indictment does not provide Ortiz notice of the charge against him is absurd.  The second superseding indictment describes the goal of the conspiracy, the role of the defendant, the time frame, many of the participants, and many of the overt acts in furtherance of the conspiracy.  It amply satisfies the requirement of concise notice to the defendant, permitting him to prepare a defense and avoid double jeopardy for the same offense.

The dispositive case is Wong Tai v. United States, 273 U.S. 77 (1927).  There, the indictment charged a conspiracy to violate the Opium Act with respect to opium imported into the United States.  It alleged that the defendant conspired with another named person and others to violate the Act, and that in furtherance of this agreement committed a number of overt acts. The defendant attacked the indictment as vague and indefinite,

but the Supreme Court disagreed, finding that the indictment adequately apprised the defendant of the nature of the allegation. "In charging such a conspiracy, 'certainty to a common intent, sufficient to identify the offense which the defendant conspired to commit, is all that is necessary.'" Id. at 81 (quoting Williamson v. United States, 207 U.S. 425, 447 (1908)).

Similarly, Judge Learned Hand, in United States v. White, 171 F. 775 (S.D.N.Y. 1909), found that a conspiracy may be pled in the words of the statute, and need not allege all pertinent facts. "To allege that the defendants conspired is, at least, to allege that they agreed to do the matters which are set forth as the substance of their conspiracy." Id. at 776.

Thus, an indictment which charges that the defendants did "agree together and with each other" is sufficient pleading of that essential fact, and there is no requirement of any further definition of the agreement. United States v. McLeod, 493 F.2d 1186, 1189 (7th Cir. 1974); United States v. Manetti, 323 F. Supp. 683, 688 (D. Del. 1971). See also Stein v. United States, 313 F.2d 518, 520 (9th Cir. 1962) (a conspiracy charge is sufficient where it alleges every essential element), cert. denied, 373 U.S. 918 (1963).

Ortiz, seeking to peek inside the entirety of the

government's investigative files, asks for the information regarding whether other uncharged individuals were involved in the offenses, the specific circumstances of his involvement, among other things. There is no legal authority for such a request. A bill of particulars is not a discovery process. Rather, it is a complement to an indictment, and compelled only in those rare cases where the indictment does not provide the defendant with the information needed for him to prepare a defense. "A bill of particulars, unlike discovery, is not intended to provide the defendant with the fruits of the government's investigation . . . . Rather, it is intended to give the defendant only that minimum amount of information necessary to permit the defendant to conduct his own investigation." United States v. Smith, 776 F.2d 1104, 1111 (3d Cir. 1985).

Significantly, a bill of particulars, like an indictment, restricts the government's proof to the allegations set forth in the bill. Id. Thus, the bill concerns only the broadest outlines of the government's case, and should not be permitted to restrict the government's evidence in advance of trial. This rule exists to protect against "the unfairness that can result from forcing the government to commit itself to a specific version of the facts before it is in a position to do so." United States v. Rosa, 891 F.2d 1063, 1066 (3d Cir. 1989).

Therefore, "[o]ne of the main policy reasons for restricting [the] applicability [of a bill of particulars] is to avoid 'freezing' the Government's evidence in advance of trial." United States v. Boffa, 513 F. Supp. 444, 485 (D. Del. 1980).

In short, a bill of particulars is granted only when the indictment is too vague to notify the defendant of the charges, to avoid surprise, or protect against double jeopardy. It is "firmly established" that "a defendant is entitled neither to wholesale discovery of the Government's evidence . . . nor to a list of the Government's prospective witnesses . . . ." United States v. Addonizio, 451 F.2d 49, 63-64 (3d Cir. 1971), cert. denied, 405 U.S. 936 (1972). Accord United States v. Eufrasio, 935 F.2d 553, 575 (3d Cir.), cert. denied, 502 U.S. 925 (1991); United States v. LBS Bank-New York, Inc., 757 F. Supp. 496, 507 (E.D. Pa. 1990); United States v. Peifer, 474 F. Supp. 498, 501 (E.D. Pa. 1979), aff'd mem., 615 F.2d 1354 (3d Cir.), cert. denied, 446 U.S. 940 (1980).

In this case, as explained above, the second superseding indictment adequately apprises the defendant of the nature of the charge against him. There is no requirement for any additional pleading of particular allegations. In a conspiracy case, the defendant is not entitled to a detailed description of an overt act not alleged in the indictment. The Third Circuit

specifically so held in <u>United States v. Armocida</u>, 515 F.2d 49

(3d Cir.), <u>cert. denied</u>, 423 U.S. 858 (1975):  "Appellant's

request for the 'when, where and how' of any overt acts not

alleged in the indictment was tantamount to a request for

'wholesale discovery of the Government's evidence,' which is not

the purpose of a bill of particulars under Fed.R.Crim.P. 7(f)."

<u>Id</u>. at 54.  <u>See also</u> <u>United States v. Heldon</u>, 479 F. Supp. 316,

323 (E.D. Pa. 1979) (denying bill of particulars to provide

details regarding specific conspiratorial acts); <u>United States v.</u>

<u>Maletteri</u>, 35 F.R.D. 225, 226 (E.D. Pa. 1964) (same).

       As the court held in <u>United States v. Matos-Peralta</u>, 691 F.

Supp. 780 (S.D.N.Y. 1988):

              With respect to conspiracy charges in particular, since
              the government is not required to prove exactly when or
              how a conspiracy was formed or when or how a particular
              defendant joined the scheme, and as the circumstantial
              proof on which the government usually relies to prove
              the existence of a scheme does not reveal such details,
              the courts have consistently rejected demands for
              particulars as to the formation of a conspiracy or the
              entry into the conspiracy of a particular defendant or
              confederate.

<u>Id</u>. at 791.  The opinion of the same court in <u>United States v.</u>

<u>Guerrerio</u>, 670 F. Supp. 1215 (S.D.N.Y. 1987), is also

instructive:

              Perhaps, the particulars sought would be useful to the
              defendants.  A bill of particulars, however, is not a
              discovery tool and is not intended to allow defendants

> a preview of the evidence or the theory of the
> government's case.  Further, the government is not
> obliged to disclose the precise manner in which the
> crimes alleged in the indictment were committed.

<u>Id</u>. at 1224-25.

For all of these reasons, Ortiz's motion for a bill of particulars should be denied.

XII. <u>CONCLUSION</u>

For the foregoing reasons, the government respectfully requests that the Court enter the attached proposed order and deny the defendant's motions.

<div style="margin-left:40%">

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney
Eastern District of Pennsylvania


____/s_____
ASHLEY K. LUNKENHEIMER
SOZI PEDRO TULANTE
Assistant United States Attorneys

</div>

Date: June 1, 2012

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

              v.                    :        CRIMINAL NO. 11-251-8

MIGUEL ORTIZ                      :

<u>ORDER</u>

And now, this      day of                    , 2012,
upon consideration of the following defendant's pre-trial motions
and the government's consolidated response thereto, it is it is
hereby ORDERED that:

    - defendant's Motion to Suppress is DENIED;

    - defendant's Motion to Preclude Testimony for Pre-Trial
Hearing as to Existence of Conspiracy is DENIED;

    - defendant's Motion to Preclude In-Court Video
Identification is DENIED;

    - defendant's Motion for Disclosure of Corrlinks E-mails is
DENIED;

    - defendant's Motion for Preservation and Disclosure of
Rough Notes is DENIED;

    - defendant's Conditional Motion for Disclosure of Reports,
Documents, and the Like Pertaining to Destroyed/Misfiled Evidence
is DENIED as moot;

    - defendant's Motion to Compel Discovery is DENIED;

    - defendant's Motion for Early Disclosure of Jencks is

DENIED; and

     - defendant's Motion for a Bill of Particulars is DENIED.


     And upon consideration of the Defendant's Motion to Preclude Admission of Prior Conviction and the Government's Motion Pursuant to Federal Rule of Evidence 404(b) to Admit Evidence and opposition thereto, it is FURTHER ORDERED that defendant's motion is DENIED for the reasons stated in the government's response. Furthermore, it is ORDERED that the government's Motion Pursuant to Federal Rule of Evidence 404(b) to Admit Evidence is GRANTED.

     The Court finds that the evidence of defendant's prior conviction is admissible because it is relevant and probative, is not offered to prove the defendant's character, and its probative value is not substantially outweighed by the danger of unfair prejudice to the defendant.  The defendant's prior conviction for aiding and abetting and possession with intent to distribute 18 kilograms of cocaine establishes his plan, knowledge, intent, and absence of mistake or accident, with respect to Count One of the Second Superseding Indictment.

     The Court finds that the evidence of defendant's relationship with any government witnesses that pre-dates the charged conspiracy is admissible under Rule 404(b) because it establishes the pertinent background of the charged offense and

the relationship between the defendant and the witness.


                         BY THE COURT:


                         _____
                         HONORABLE JAN E. DuBOIS
                         *Senior Judge*
                         *United States District Court*

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have caused  a correct copy of the foregoing filing to be delivered to the following by filing it with the Court's electronic case filing system and by electronic mail:

Michael J. Diamondstein, Esquire
2 Penn Center, Suite 900
Philadelphia, PA 19102
mjd@michaeldiamondstein.com

*Counsel for Miguel Ortiz*

_____/s_____
SOZI P. TULANTE
ASHLEY K. LUNKENHEIMER
Assistant United States Attorneys

DATED: May 31, 2012

104