IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| vs. | : | |
| | : | |
| MIGUEL ORTIZ, | : | NO.  11-251-08 |
| a/k/a "Miguelito," | : | |

DuBOIS, J.                                             July 20, 2012

**M E M O R A N D U M**

## TABLE OF CONTENTS

I.       INTRODUCTION ........................................................................................ 1

II.      BACKGROUND ......................................................................................... 1

    A.    How GPS Trackers Work and How DEA Agents Use Them ....................................... 2
    B.    Initial Investigation—Information from Confidential Source of Information ........... 4
    C.    Investigation Following November 8, 2010, Meeting with Confidential Source of Information; Tracker Number One Installed ............ 6
    D.    Use of Tracker Number One; Increase in Activity at the Warehouse ........................ 8
    E.    Surveillance of Defendant on January 24, 2011 .............................................. 9
    F.    Placement of Tracker Number Two ................................................................... 11
    G.    Monitoring of Tracker Number Two Leads to Recovery of $2.3 Million in Suspected Drug Proceeds ....................................................... 14

III.     LEGAL STANDARD .................................................................................. 15

IV.     DISCUSSION ........................................................................................... 15

    A.    <u>United States v. Jones</u> ................................................................................ 16
    B.    Whether the Use of the GPS Trackers Was Lawful ............................................. 18
        1.    Reasonable Suspicion ...................................................................................... 18
        2.    The Automobile Exception ................................................................................ 29
        3.    Conclusion ...................................................................................................... 34
    C.    Whether the Exclusionary Rule Applies .............................................................. 34
        1.    The Exclusionary Rule and <u>Davis v. United States</u> ............................................ 35
        2.    Parties' Arguments .......................................................................................... 37
        3.    Analysis .......................................................................................................... 38

V.      CONCLUSION .......................................................................................... 44

## I.      INTRODUCTION

Defendant Miguel Ortiz is charged by Third Superseding Indictment with offenses arising from his alleged involvement in a large-scale drug distribution scheme.  Defendant filed several pretrial motions, and the Court held a hearing and oral argument on June 21 and 22, 2012.  This Memorandum addresses defendant's Motion to Suppress Evidence, which presents issues relating to the government's use of GPS tracking devices left unsettled by the United States Supreme Court's decision in United States v. Jones, 132 S. Ct. 945 (2012).  For the reasons that follow, the Court concludes that installation and monitoring of a Global Positioning System ("GPS") tracking device on a vehicle requires a warrant.  The Court further concludes that the so-called "good faith" exception to the exclusionary rule does not apply due to the absence of binding precedent authorizing warrantless GPS installation and tracking. Accordingly, the Court grants defendant's Motion to Suppress Evidence.

## II.     BACKGROUND

Defendant is charged by Third Superseding Indictment with: one count of conspiracy to distribute five kilograms or more of cocaine, twenty-eight grams or more of cocaine base ("crack"), and marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)–(C); two counts of distribution of and aiding and abetting the distribution of five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2; and one count of distribution of and aiding and abetting the distribution of five kilograms or more of cocaine within 1,000 feet of a school, in violation of 21 U.S.C. § 860(a) and 18 U.S.C. § 2.[1]  Defendant filed a document entitled Omnibus Pre-Trial Motions on May 11, 2012 ("Omnibus Motion"), which contained ten

---

[1] Eight other co-defendants were charged in the Second Superseding Indictment.  Many of them have either entered into plea agreements with the government or have notified the Court that they intend to do so.

separate motions, including the Motion to Suppress Evidence.  He subsequently filed two amendments to the Omnibus Motion as well as a Motion in Limine.

The Court held a hearing and heard oral argument on June 21 and 22, 2012.  At the hearing and by Orders dated June 22, 2012, the Court resolved a number of defendant's pretrial motions, set forth a schedule and procedure to address certain other motions, and took under advisement, inter alia, defendant's Motion to Suppress Evidence, on which the Court now rules.

The Motion to Suppress Evidence arises from the fact that Drug Enforcement Administration ("DEA") agents attached two separate GPS tracking devices to defendant's vehicle during their investigation without obtaining a warrant.  Defendant moves to suppress the GPS data and "any and all observations made by agents as a result of utilizing" the GPS monitoring.  (Def. Mot. Suppress Evidence ("Def. Mot."), part of Def. Miguel Ortiz's Omnibus Pre-Trial Motions, at 3.)

### A.    How GPS Trackers Work and How DEA Agents Use Them

DEA agents typically use a GPS tracker that is "the size of [a] fist, and it has two very strong magnets attached to it."  (June 21, 2012, Hr'g Tr. ("6/21/12 Tr.") 65.)  Because each tracker has its own battery, it does not rely on the car for power.  (Id.)  The DEA agents call this style of device a "slap on" tracker because it can be installed merely by "slapping it" onto a vehicle's undercarriage.  (Id. at 67.)  The case agent, DEA Special Agent David Pedrini, testified that agents generally place the tracker on "the bottom of the undercarriage of the vehicle, . . . usually towards the rear bumper."  (Id. at 65.)  The tracker "pings" periodically, meaning that its location is logged wirelessly to a remote computer server at a time interval that is adjustable.[2]

_____

[2] GPS trackers determine their location through the GPS system, which is "a constellation of orbiting satellites that provides navigation data to military and civilian users all over the world."

(Id. at 65–66; see also id. at 129.)  Agents can log on to a secure website to view the log of the tracker's location.  (Id. at 66.)  According to Agent Pedrini, the tracker has a "50 yard to 100 yard" margin of error, so his practice is to confirm a vehicle's location by physical surveillance if he needs to determine it with precision.  (Id. at 66–67.)  Moreover, because the pings are one-directional, agents only know where the tracker is when it transmits a ping and cannot remotely determine where the tracker is until it pings again.  (Id. at 68 ("[I]t's only telling us where the vehicle is at [intervals of] 20 minutes.  Let's say we ping it at 2:00 o'clock, that vehicle can drive around and go wherever it wants until 2:20 and we don't know where that vehicle went until 2:20, then it tells us where it is.").)

Agent Pedrini stated at the hearing that his "practice" in determining whether or not to use a tracker in an investigation is that "if the target is big enough, and we believe that the . . . vehicle is used to distribute drugs, or distribute or pick up drug proceeds, then . . . I would like to put [a] tracker on that vehicle."  (Id. at 64–65.)  When asked whether he believed he needed a warrant to install a tracker, Agent Pedrini testified that, in his fifteen years of experience with the DEA in the Eastern District of Pennsylvania, "if the vehicle was parked on a public way, on a public street," the agents did not need a warrant or a court order.  (Id. at 67; see also id. at 125 ("I thought I was acting in good faith, in my 15 years here in the district.  I didn't believe we needed a warrant.").)  However, Agent Pedrini understood that "if the vehicle was parked inside of a garage," a warrant would be necessary.  (Id. at 67.)  He testified that if he had

---

Air Force Space Command, "Factsheet: Global Positioning System," United States Air Force (June 26, 2012), http://www.af.mil/information/factsheets/factsheet.asp?id=119.  The twenty-four satellites "orbit the earth every 12 hours, emitting continuous navigation signals," and devices like the trackers "receive these signals to calculate time, location and velocity."  Id.

needed a warrant in this case, he would have applied for one by contacting the United States Attorney's Office.  (Id. at 114.)

Defendant's counsel cross-examined Agent Pedrini extensively about the agent's understanding of the law governing the use of GPS trackers.  Agent Pedrini acknowledged that the interpretation of the Constitution could change over time and that "the law changes based upon the way technology changes."  (Id. at 126.)  The following exchange also took place:

> Q.  So you certainly knew then, because you've dealt with these before, that with respect to these trackers other jurisdictions feel otherwise with respect to the trackers.  Did you know that?
>
> A.  I think I did, but I also knew that this district didn't require an order.
>
> Q.  Did you[] know that there was a case on appeal . . . such that you knew that the United States Supreme Court was hearing that very issue?
>
> A.  No.
>
> Q.  Did you think to yourself, at all, in any point of time that, geez, I might want to run this by an attorney, someone who may know a bit more than I about whether or not we can actually put a tracker on the car?
>
> A. No.
>
> Q.  But it's something you could have done, you just chose not to?
>
> A.  Correct.

(Id. at 126–27.)

### B.    Initial Investigation—Information from Confidential Source of Information

In October 2010, Agent Pedrini and his partner, DEA Special Agent Paul Gimbel, received information from a confidential source of information ("SOI") that Miguel Ortiz's co-defendant Nelson Rodriguez was operating a large drug trafficking group ("DTG") out of a garage or warehouse at 3075 Jasper Street in North Philadelphia ("Warehouse").  (Id. at 49–50.)

The SOI further informed the agents that another co-defendant, Gribbin Ortiz, was the owner of the Warehouse and that two other co-defendants, Angel Ayala-Aponte and Nelson Rodriguez's son, Nelson Rodriguez, Junior, were involved in the DTG.  (Id. at 50, 54–55.)

The agents took the SOI with them to investigate the Warehouse.  (Id. at 50–52.)  At that site, the agents learned that it spanned an entire block between Helen and Jasper Streets and had entrances on both streets such that "if you went in on the Jasper Street side, you could . . . exit on the Helen Street side."  (Id. at 50–52, 71.)  Clearfield Street was the cross-street to the north, and the Willard School adjoined Helen and Jasper Streets to the south.  (Id. at 51–53.)  Agent Pedrini opined at the hearing that the Warehouse was "ideal for drug trafficking" for several reasons: both Jasper and Helen Streets were one-way streets without much vehicular traffic and had a "number of garages," which made it "very difficult to conduct surveillance or park for significant periods of time" because it would "look out of the ordinary"; when the school at the end of Jasper Street was not open, Jasper Street turned into a dead-end street because the school's gate would be closed.  (Id. at 52–54.)  Agent Pedrini also observed that there were surveillance cameras at each entrance to the Warehouse and that there were no signs that there was "an official business" operating out of the property.  (Id.)  By searching public records, the agents confirmed that Gribbin Ortiz was the owner of the Warehouse and that no businesses were registered as operating out of the Warehouse.  (Id. at 54.)  They also learned that Nelson Rodriguez and Ayala-Aponte had prior convictions for cocaine trafficking.  (Id. at 58.)

Agents Pedrini and Gimbel began investigating the SOI's allegations, performing physical surveillance at the Warehouse for limited periods of time in October and November 2010 when they were not busy with other cases.  (Id. at 55.)  The agents noted that the Warehouse "wasn't very active," although they observed Nelson Rodriguez and Ayala-Aponte

visiting the Warehouse for "short periods of time." (Id. at 55–56.)  Whenever individuals

entered the Warehouse, Agent Pedrini noticed that "they close[d] the garage doors pretty quickly

as cars were coming in and out," which he found suspicious because he believed a legitimate

business would leave its doors open. (Id. at 56–57.)

On a day in late October 2010, Agent Pedrini was parked at the intersection of Helen and

Clearfield Streets when he observed a red minivan pull into the Jasper Street entrance of the

Warehouse. (Id. at 56.)  The garage door closed "immediately." (Id.)  Seeking to confirm that

drug-trafficking activity was occurring in the Warehouse, Agent Pedrini arranged for

Philadelphia police officers to follow the red minivan when it left the Warehouse forty-five

minutes later. (Id. at 59–60.)  After "several hours" of surveillance, the police pulled over the

minivan. (Id. at 60.)  During the traffic stop, a police narcotics canine alerted for the presence of

narcotics, but police did not find any narcotics or other contraband. (Id.)

### C.    Investigation Following November 8, 2010, Meeting with Confidential Source of Information; Tracker Number One Installed

Agent Pedrini met with the SOI again on November 8, 2010. (Id. at 60–61.)  The SOI

informed him that defendant "was responsible for picking up drug proceeds as well as dropping

off cocaine" for the DTG. (Id. at 61.)  The SOI stated that defendant lived at 3331 Emerald

Street in Philadelphia—which is within "half a mile" of the Warehouse—and that defendant

drove "a blue Ford F150 pickup truck with limited rims" ("blue pickup truck"). (Id.)  According

to the SOI, if the agents "saw [defendant] operating that blue Ford 150 pickup truck with the

limited rims . . . inside the garage at Jasper Street, he was most likely dropping off cocaine or

picking up drug proceeds." (Id.)

On November 9, 2010, Agent Pedrini conducted surveillance at 3331 Emerald Street in

an effort to corroborate the new information received from the SOI. (Id. at 62.)  He observed a

Hispanic male and a Hispanic female emerge from a red truck and approach the house at 3331 Emerald Street.  (Id.)  A second man who fit defendant's description greeted the man and woman and let them into the residence.  (Id.)  The next day, Agent Pedrini obtained defendant's driver's license photograph and confirmed that the second man was defendant.  (Id.)  The following day, Agent Gimbel drove by 3331 Emerald Street and observed the blue pickup truck parked across from the house.  (Id.)  Agent Pedrini consulted Department of Motor Vehicles records and learned that the blue pickup truck was registered to "Dino Ortiz."  (Id. at 63.)  Agent Pedrini also ran a criminal records check on defendant and learned that he had a prior felony conviction for narcotics trafficking.  (Id. at 102.)

In early December 2010, agents applied for and were granted a court order allowing installation of two video cameras on utility poles near the Warehouse ("pole cameras") so that agents could monitor the suspected DTG activity without having to conduct physical surveillance.  (Id.)  Agent Pedrini testified that he accompanied the DEA Technical Operations Unit to the Warehouse "late at night" on December 3, 2010.  (Id. at 63–64.)  While they were near the Warehouse to install the pole cameras, Agent Pedrini and the technical operations agents drove by 3331 Emerald Street and saw that the blue pickup truck was parked outside.  (Id.)  Agent Pedrini asked the technological operations agents if they had any portable GPS tracking devices with them.  (Id.)  Upon learning that they did, Agent Pedrini placed a tracking device ("Tracker Number One") on the undercarriage of the blue pickup truck.  (Id.)  Agent Pedrini stated on cross-examination that he had spoken to prosecutors from the United States Attorney's Office "[t]wo or three times" before installing Tracker Number One and that, at the time of installation, he had cellular telephone numbers for the prosecutors.  (Id. at 124–25.)  However, Agent Pedrini did not ask the prosecutors whether he was permitted to install the tracker without

a warrant.  (Id. at 125; see also id. at 140 (explaining that he did not call an Assistant United

States Attorney because "that wasn't the policy of this district").)

> ### D.      Use of Tracker Number One; Increase in Activity at the Warehouse

Tracker Number One was active from its installation on December 3, 2010, until its

battery died on January 1, 2011.  (See id. at 68.)  The agents did not obtain any inculpatory

information about defendant or the DTG from using Tracker Number One.  (Id.)

Throughout December 2010 and January 2011, agents monitored the pole cameras.  (Id.

at 75.)  Beginning on January 20, 2011, the agents observed a significant increase in activity at

the Warehouse, which led them to believe that a "large shipment of cocaine arrived at the

garage" in a Ford Escort station wagon that had entered the Warehouse.  (Id. at 75–77.)  On

several occasions on January 20, 2011, and the days that followed, the following pattern

repeated.  (Id.)  An individual would park outside the Warehouse in a vehicle the agents had not

seen before.  (Id.)  The garage door would open, the individual would enter the building empty-

handed, and the garage door would shut immediately.  (Id.)  Then the individual would exit the

building carrying "a large trash bag" that, "by the way [the individual] was carrying it . . .

appeared to be very heavy."  (Id. at 76.)  At the June 21, 2012, hearing, the government

introduced a video of two examples of this pattern: one that took place at 12:38 p.m. on January

21, 2011, involving an unidentified man who drove a grey Ford Explorer, and another that took

place around 1:00 p.m. on January 21, 2011, involving a maroon sedan.  (Id. at 76–80; see also

Gov't Hr'g Ex. 2 (video of 12:38 p.m. incident), Gov't Hr'g Ex. 3 (video of 1:00 p.m. incident).)

According to Agent Pedrini, the individuals who exited the Warehouse carrying trashbags

"returned . . . within a day or two later."  (Id. at 80.)  When they returned, "instead of going into

the garage empty-handed and leaving with bags[,] they brought bags into the garage . . . and left

empty-handed."  (Id.)

Agent Pedrini opined that the behavior he observed on the pole cameras was "consistent . . . with the type of volume that [the DEA agents] believed Nelson Rodriguez was trafficking"— i.e., "anywhere from five to ten to fifteen kilograms of cocaine."  (Id. at 80–81.)  The pickup and dropoff pattern occurred, Agent Pedrini stated, because "the cocaine is given on consignment," meaning that buyers "sell their kilograms to their customers, receive their money, and then in turn pay Nelson Rodriguez the drug proceeds owed."  (Id. at 81–82.)  Therefore, agents believed that when the individuals entered the Warehouse empty-handed and exited carrying bags, the individuals were picking up cocaine, and when they returned carrying bags and left empty-handed, they were dropping off proceeds.  (See id. at 80–83.)  Agent Pedrini believed that, once the proceeds had been delivered to the Warehouse, Nelson Rodriguez was counting the funds because he was also likely "given cocaine on consignment in an agreement that he's going to pay for his hundred kilograms of cocaine eventually, within like a week period, whenever he gets his drug proceeds back."  (Id. at 83–84.)  In support of this belief, Agent Pedrini testified that Nelson Rodriguez remained at the Warehouse far later than usual, "almost until midnight," on January 22, 2011.[3]  (Id. at 85–87; see also id. at 136.)

**E.      Surveillance of Defendant on January 24, 2011**

Agent Pedrini believed that "since the money was [in the Warehouse], . . . somebody was going to come pick up the money."  (Id. at 87.)  Accordingly, when he noticed continued activity at the Warehouse on January 24, 2011, he wanted to conduct surveillance in person.  (Id. at 87–88.)  Agent Pedrini parked at the intersection of Helen and Clearfield Streets in an unmarked DEA vehicle.  (Id.)  Around "mid-afternoon," he saw defendant drive the blue pickup truck past

---

[3] Agent Pedrini originally testified that this date was January 23, 2011, but later corrected himself.  (6/21/12 Tr. 85–87.)

him on Helen Street.  (Id. at 88–89.)  Defendant, whose truck window was rolled down, was wearing a beige jacket and an orange t-shirt.  (Id.)  Agent Pedrini watched as defendant parked in front of the Helen Street entrance to the Warehouse, waited for the garage door to open, and backed the blue pickup truck into the garage.  (Id. at 89–90.) Then the garage door closed.  (Id.) Agent Pedrini noted that the blue pickup truck had a black vinyl truck bed cover, which was "rolled up towards the rear windshield of the vehicle, exposing the bed of the truck" when the blue pickup truck entered the Warehouse. (Id.)  When defendant drove the blue pickup truck out of the Warehouse "several minutes" later, Agent Pedrini saw that the black vinyl cover was covering the truck bed. (See id. at 89–90, 135.)  Because the truck bed was covered, Agent Pedrini believed that it contained contraband.  (Id. at 136.)

Based on these observations, Agent Pedrini arranged for DEA surveillance to follow defendant when he left the Warehouse.  (Id. at 90.)  The surveillance team followed defendant to a "garage on the 1900 block of Westmoreland Street," which was located between a quarter-mile and a half-mile from the Warehouse and less than a block from defendant's house.  (Id. at 90–91.)  Defendant drove the blue pickup truck into the garage on Westmoreland Street, and the garage doors closed behind him.  (Id. at 91.)  Defendant remained in the garage for "a couple of hours" and then exited, driving the blue pickup truck "right around the corner to his house at 3331 Emerald Street."  (Id. at 91–92.)  When defendant drove out of the Westmoreland Street garage, he was accompanied by "two other Hispanic males that [the DEA agents] hadn't seen before in [their] investigation."  (Id. at 92.)  Defendant and the two males parked the blue pickup truck and entered his home.  (Id.)  When he entered the house, defendant was not carrying anything, which Agent Pedrini believed showed that defendant "left the drug proceeds at the garage" on Westmoreland Street.  (Id.)

**F.      Placement of Tracker Number Two**

The agents continued their surveillance of defendant on January 24, 2012.  In the

evening, defendant and the two males left 3331 Emerald Street and went to a Mexican restaurant

at 5th and Thompson Streets.  (Id. at 92–94.)  Agent Pedrini was present when defendant and the

two men left the Mexican restaurant, and he recognized defendant's orange shirt and light-

colored jacket.  (Id. at 94.)  Defendant and the men reentered the blue pickup truck, and the

agents followed defendant as he drove to Sugar House Casino, which is located on Delaware

Avenue in Philadelphia.  (Id. at 94–95.)  Defendant parked the blue pickup truck in the Sugar

House Casino parking lot.  (Id.)  Agent Pedrini stated that he believed the Sugar House Casino

parking lot was a "public parking lot," (id. at 94), and clarified on cross-examination that his

belief was based on the fact that "anyone could park there" and he did not think "anyone's

keeping tabs" of who parks in the lot, (id. at 141; see also id. at 116 (Agent Pedrini's testimony

agreeing that "[a]nyone could use that parking lot notwithstanding the fact that they might not be

going to Sugar House")).  Defendant and the two men entered the casino.  (Id. at 94.)

While defendant and the two men were in the Sugar House Casino, Agent Pedrini

decided to have a second GPS tracker ("Tracker Number Two") installed on the blue pickup

truck.  (Id.)  Agent Gimbel installed Tracker Number Two at Agent Pedrini's direction,

removing Tracker Number One at the same time.  (Id. at 95.)  Tracker Number Two was "the

same style tracker" as Tracker Number One, and it produced "the same information" which the

agents could access through "the same process."  (Id.)

Agent Pedrini testified that:

> [A]t that point, based on all of the observations . . . in my opinion
> . . . Mr. Ortiz picked up drug proceeds at the Jasper Street garage
> with that blue pickup truck, I made the decision to install—to slap
> on, as we refer to it, another tracker on that vehicle, because I

> believed that I had probable cause that that vehicle was being used
> to transport drug proceeds.

(Id. at 94–95.)  Agent Pedrini stated that his goal in placing Tracker Number Two on the blue

pickup truck—and in choosing not to arrest defendant or search the vehicle for contraband—was

"to watch Miguel Ortiz deliver these drug proceeds to a tractor trailer . . . and then follow the

tractor trailer out of the area, and take off the tractor trailer and seize the money, and continue

our investigation of the Nelson Rodriguez drug-trafficking organization."[4]  (Id. at 101; see also

id. at 144 (describing "the main focus" of installing Tracker Number Two as "see[ing] it meet

with the tractor trailer").)  Searching the vehicle immediately or arresting defendant were not

preferable options, Agent Pedrini testified, because the agents "wanted to continue that

investigation" and not "alert any of the members of the [DTG]."  (Id. at 143–44.)

        Agent Pedrini stated that, as with Tracker Number One, he did not contact anyone from

the United States Attorney's Office prior to installing Tracker Number Two because "that wasn't

the policy of this district" and he believed that he had "probable cause and . . . could put on a

tracker."  (Id. at 140.)  He also testified as follows:

> THE COURT: You testified earlier that you didn't think a search
> warrant was required in order to place the GPS tracker, is that
> correct?
>
> THE WITNESS: That's correct.
>
> THE COURT:  If you had thought otherwise, if you thought that a
> search warrant was required, there was nothing that prevented you,

---

[4] According to Agent Pedrini, DEA agents placed three trackers on vehicles in their investigation
of the DTG: defendant's car and two others.  As to the other two vehicles, agents "learned that
[one] wasn't involved" and "immediately took that tracker off," but they learned that the other
tracked vehicle was, in fact, "dropping off drugs and picking up drug proceeds."  (Id. at 113.)
Agents declined to place a tracker on the vehicle of the alleged ringleader of the DTG, Nelson
Rodriguez, because, according to Agent Pedrini, that car "was mostly parked . . . in a gated
driveway and I knew I would need to get a warrant for that."  (Id.)

that would have prevented you from obtaining a search warrant
. . . that would not have interfered with your investigation—

THE WITNESS:  Correct.

THE COURT: Is that correct?

THE WITNESS: Correct.  If I believed that I needed a warrant to
install that tracker, I believe based on all the information that I
gathered over the previous four days, I believed I had probable
cause to put a tracker on that.  But again, in my 15 years here in the
Third District, it was my opinion that[—]and I believed that[—]I
didn't need a warrant for that.

(Id. at 101–02.)

Asked on direct examination whether he believed that the blue pickup truck "would have

certain evidence of Mr. Ortiz's criminal activity" at the time Tracker Number Two was installed,

Agent Pedrini responded, "[p]ossibly, it could—it could have tally sheets in the passenger

compartment of the vehicle . . . ."  (Id. at 97; see also id. at 100 ("THE COURT: And you didn't

think there was contraband in the truck at that point?  THE WITNESS: As Mr. Tulante just

asked, there could have been tally sheets as far as what Mr. Rodriguez owed.").)  Agent Pedrini

further testified that, at the time the tracker was installed, he believed that the drug proceeds—

which could be "hundreds of thousands of dollars, if not millions," and which would "have to be

put into bags, not something you could carry on your person"—were in the Westmoreland Street

garage, not in the blue pickup truck.  (Id. at 98–100, 102.)

While Agent Gimbel installed the tracker, Agent Pedrini followed defendant inside the

casino and covertly observed defendant playing roulette at a table near the casino entrance.  (Id.

at 95.)  According to Agent Pedrini, defendant was "spending a lot of money," "placing 500 to a

thousand dollars on [each] wheel spin," while the two other men watched.  (Id.)

-13-

**G.      Monitoring of Tracker Number Two Leads to Recovery of $2.3 Million in Suspected Drug Proceeds**

The agents began to monitor Tracker Number Two in the same way they monitored Tracker Number One.  (Id. at 107.)  On January 28, 2011, Agent Pedrini saw that the blue pickup truck had recently "been in the area" of Bath and Orthodox Streets in Philadelphia.  (Id. at 108.)  He believed this to be significant because of his suspicion that defendant was using the blue pickup truck "to transport or deliver drug proceeds to a tractor trailer . . . which would eventually go to Mexico."  (Id. at 109.)  Because the intersection of Bath and Orthodox Streets is close to an exit from Interstate 95 and because his DEA group had seized $2.2 million in drug proceeds from a tractor trailer in that area during the summer of 2010, Agent Pedrini believed that the blue pickup truck was in that area to transfer money to a tractor trailer.  (Id.)  Agent Pedrini drove out to the area.  (Id.)  He did not see the blue pickup truck, but he saw defendant, wearing the "same orange long-sleeve T-shirt," park a gray pickup truck in a truck depot next to a "large red tractor trailer with Wisconsin license plates."  (Id. at 109–10.)  A few minutes later, the tractor trailer left.  (Id.)

Agent Pedrini followed the tractor trailer north on Interstate 95 to Langhorne, Pennsylvania, and observed it exit the highway and pull over on the shoulder.  (Id. at 110–11.)  Agent Pedrini testified that he "decided to approach the tractor trailer driver," who consented to a search of the truck.  (Id. at 111.)  Agents recovered $2.3 million, and a canine sniff was positive for the presence of narcotics on the money.  (Id. at 111–12.)

The agents continued monitoring Tracker Number Two until the battery died "a couple weeks" later.  (Id. at 112.)  The agents executed a search warrant at the Warehouse on March 29, 2011, and arrested several individuals.  See United States v. Gonzalez, Cr. No. 11-410, 2011 WL 4467681, at *3 (E.D. Pa. Sept. 23, 2011) (denying bail motions in companion case involving

-14-

DTG distributors).  Defendant was arrested in Puerto Rico on November 10, 2011, and his initial appearance was held in this District on December 20, 2011.

## III.    LEGAL STANDARD

"On a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005); see also United States v. Coward, 296 F.3d 176, 180 (3d Cir. 2002). The applicable burden is proof by a preponderance of the evidence. United States v. Matlock, 415 U.S. 164, 178 n.14 (1974).

## IV.    DISCUSSION

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  The government acknowledges that, pursuant to the Supreme Court's decision in United States v. Jones, 132 S. Ct. 945 (Jan. 23, 2012), the attachment of GPS trackers[5] to defendant's vehicle and the subsequent monitoring of those devices were "searches" within the meaning of the Fourth Amendment.  (Resp. Mot. Suppress Info. Derived from GPS Tracking Device, part of Gov't Consolidated Resp. & Mem. L. Opp'n Def. Miguel Ortiz's Omnibus Pre-Trial Mots. ("Gov't Resp.") 14–15.)

---

[5] The government avers that it "does not expect at trial to introduce any evidence obtained from the use of Tracker [Number One] and, in any event, no evidence was obtained with the use of Tracker [Number One]."  (Gov't Resp. 19 n.2; June 22, 2012, Hr'g Tr. 15.)  Because the Court concludes that a warrant was required and the exclusionary rule applies, the Court's analysis applies equally to both trackers.

Conceding that the DEA agents did not obtain a warrant authorizing installation and monitoring of the GPS trackers, the government nonetheless asserts that the evidence obtained from the trackers should not be suppressed.   It makes three alternative arguments in support of its position: (1) "neither a warrant nor probable cause should be required" for use of GPS tracking; instead, reasonable suspicion should be required, and that standard was met, (Gov't Resp. 16–27); (2) if probable cause is required, the automobile exception to the warrant requirement applies because the DEA agents had probable cause that defendant was using the blue pickup truck "to transport drug-related contraband for the DTG," (id. at 28–33); (3) even if a warrant was required and defendant's Fourth Amendment rights were violated, the exclusionary rule does not apply and the evidence should not be suppressed because the agents "acted in objective good faith on the basis of existing law," (id. at 34).

This Memorandum begins by reviewing the Supreme Court's opinion in Jones.  It then addresses each of the government's arguments, considering whether the search can be upheld based on reasonable suspicion before addressing whether the automobile exception applies. Because it concludes that a warrant was required, the Court then addresses the applicability of the exclusionary rule.  As set forth below, the Court rejects each of the government's arguments and concludes that the evidence must be suppressed.

> A.   **United States v. Jones**

In Jones, the Supreme Court held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'"  132 S. Ct. at 949.  Justice Scalia's majority opinion does not state whether the attachment and monitoring of a GPS device would pass Fourth Amendment scrutiny if supported by reasonable suspicion or probable cause.  Id. at 954 (holding that this argument was "forfeited"

because the government did not raise it in the lower courts).  That is the issue presented by this case.

Notably, the majority opinion in <u>Jones</u> did not rely on the logic that use of a GPS tracker is a search because it violates a person's "reasonable expectation of privacy," which—as <u>Jones</u> acknowledged, <u>id.</u> at 949–50—has been the predominant approach to Fourth Amendment jurisprudence since the 1960s.  <u>See, e.g.</u>, <u>Bond v. United States</u>, 529 U.S. 334, 338 (2000) ("Our Fourth Amendment analysis embraces two questions. First, we ask whether the individual, by his conduct, has exhibited an actual expectation of privacy . . . .  Second, we inquire whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable." (internal quotation marks and citations omitted)).  The "reasonable expectation of privacy" test is referred to as the "<u>Katz</u> test" after the case that introduced it, <u>Katz v. United States</u>, 389 U.S. 347, 360–62 (1967) (Harlan, J., concurring).

Instead, <u>Jones</u> followed an "exclusively property-based approach" and determined that a search occurred when the government "physically occupied private property for the purpose of obtaining information," which "would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted."  132 S. Ct. at 949–50 (citing <u>Entick v. Carrington</u>, 95 Eng. Rep. 807 (C.P. 1765)).  Because it took this approach, the <u>Jones</u> Court eschewed more recent, factually similar precedent that had relied on the <u>Katz</u> test, such as <u>United States v. Knotts</u>, 460 U.S. 276 (1983) (holding that monitoring beeper signals to determine the location of a vehicle containing contraband did not violate the Fourth Amendment because it did not raise "constitutional issues which visual surveillance would not also raise").  <u>Jones</u> relied instead on cases like <u>Olmstead v. United States</u>, 277 U.S. 438 (1928), which concluded that wiretaps attached to public telephone wires did not violate the Fourth Amendment because the wires were

"not part of [the defendant's] house or office" and, thus, no search occurred when they were

tapped.  See Jones, 132 S. Ct. at 949–50.

### B.      Whether the Use of the GPS Trackers Was Lawful

The government contends first that the installation and monitoring of the GPS trackers in

this case was lawful under the Fourth Amendment even in the absence of a warrant because GPS

monitoring of a vehicle need only be supported by reasonable suspicion or, in the alternative,

because the automobile exception to the warrant requirement extends to the use of GPS trackers.

The Court addresses each argument in turn.

### 1.      Reasonable Suspicion

### i.      Parties' Arguments

The government contends that balancing the intrusion on a person's privacy interest, the

nature of the privacy interest, and the law enforcement interests compels the conclusion that

reasonable suspicion is the appropriate standard to apply to GPS installation and monitoring.

The government argues that courts performing such a balancing test have determined that

reasonable suspicion is the appropriate standard for GPS tracker installation and monitoring.  See

United States v. Marquez, 605 F.3d 604, 610 (8th Cir. 2010); United States v. Michael, 645 F.2d

252, 257-59 (5th Cir. 1981) (en banc)).  Moreover, according to the government, both prongs of

the balancing test weigh in its favor.  "The intrusion occasioned by installation of a tracking

device on a vehicle is minimal" because "[n]othing from the vehicle is removed, [] usually no

enclosed area is entered, . . . [and the GPS tracker] was battery operated, and was not wired to,

nor drew power from, the Blue Pickup's engine."  (Gov't Resp. 17–18.)  The privacy interest

implicated is minimal because GPS tracking "provides information only about the vehicle's

location" that "could also be obtained by means of visual surveillance" and "does not reveal who

is in the car as driver or passenger, what the occupants are doing, or what they do when they

arrive at their destination."  (<u>Id.</u> at 18.)  However, requiring law enforcement to obtain a warrant and probable cause before installing a tracker would "seriously impede the government's ability to investigate drug trafficking, terrorism, and other crimes" because officers "could not use GPS devices to gather information to establish probable cause."  (<u>Id.</u> at 18–19.)

In his brief, defendant did not address which standard should apply to GPS installation and monitoring, focusing instead on the application of the exclusionary rule.  (Def. Mem. 2–11.) However, at the hearing, defense counsel argued that the privacy intrusion implicit in the extended use of GPS tracking is relatively severe when compared with other investigative activities that require reasonable suspicion because "the government can find out where you are at all times" by using GPS.  (June 22, 2012 Hr'g Tr. ("6/22/12 Tr.") 49–52.)  Defendant's counsel also asserted that the government interests do not justify applying a reasonable-suspicion standard because, at least in this case, there was no exigency requiring hasty installation of the GPS tracker before the government could apply for a warrant.  (<u>Id.</u>)  In contrast, for example, <u>Terry</u> stops are permissible based on the "inherent exigency of mobility" that requires officers to dispel the possibility of criminal activity in a more immediate fashion.  (<u>Id.</u>)

### ii.    Analysis

The Fourth Amendment only protects against searches or seizures that are unreasonable, and "[w]hat is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself."  <u>United States v. Montoya de Hernandez</u>, 473 U.S. 531, 537 (1985) (citing <u>New Jersey v. T.L.O.</u>, 469 U.S. 325, 337–42 (1985)).  "Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental

interests."[6] Delaware v. Prouse, 440 U.S. 648, 654 (1979). "[T]he reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test." Id.

"In most criminal cases," the balancing analysis weighs "in favor of the procedures described by the Warrant Clause of the Fourth Amendment." Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 619 (1989) (citing United States v. Place, 462 U.S. 696, 701 & n.2 (1983), United States v. U.S. District Court, 407 U.S. 297, 315 (1972)); see also Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 653 (1995) ("Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, this Court has said that reasonableness generally requires the obtaining of a judicial warrant."). Accordingly, "[e]xcept in certain well-defined circumstances, a search or seizure in such a case is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause." Skinner, 489 U.S. at 619 (citing Payton v. New York, 445 U.S. 573, 586 (1980) and Mincey v. Arizona, 437 U.S. 385, 390 (1978)). Nonetheless, the Supreme Court has recognized exceptions to the presumption in favor of requiring a warrant "when 'special needs, beyond the normal need for law enforcement, make

---

[6] Another court in this District that addressed this question suppressed evidence obtained from GPS trackers when the government did not obtain a warrant. See United States v. Katzin, Cr. No. 11-226, 2012 WL 1646894 (E.D. Pa. May 9, 2012). The government argues that the Katzin court erred in failing to apply a reasonable-suspicion standard because that court weighed the privacy infringement with the government's interest on a "case-by-case basis" instead of "focusing on the situation presented as a class." (Gov't Resp. 25–26 ("The Court has never, for instance, required that each investigatory stop within the scope of Terry v. Ohio, 392 U.S. 1 (1968), be analyzed to determine whether relaxation of the warrant requirement is appropriate in each particular instance.").) While the Court agrees with Katzin's ultimate conclusion, the government is correct; the Supreme Court mandates that this Court determine "the standard of reasonableness governing any specific class of searches." T.L.O., 469 U.S. at 337 (emphasis added).

the warrant and probable-cause requirement impracticable.'" Id. (citations omitted) (quoting

Griffin v. Wisconsin, 483 U.S. 868, 873 (1987)).  As discussed below, "special needs" cases are

a "closely guarded category."  See Ferguson v. City of Charleston, 532 U.S. 67, 84 (2001).

**a.      The Government's Reliance on United States v.<br>Marquez and United States v. Michael is Misplaced**

The government asserts that United States v. Marquez, 605 F.3d 604, 610 (8th Cir. 2010)

and United States v. Michael, 645 F.2d 252, 257–59 (5th Cir. 1981) (en banc) stand for the

proposition that "reasonable suspicion is the appropriate test to determine the placement of the

GPS [trackers]."  (6/22/12 Tr. 13–14.)  The government's argument is rejected because neither

case is dispositive of the issues presently before this Court.

Marquez states that "when police have reasonable suspicion that a particular vehicle is

transporting drugs, a warrant is not required when, while the vehicle is parked in a public place,

they install a non-invasive GPS tracking device on it for a reasonable period of time."  605 F.3d

at 610.  However, that proposition is mere dictum; the Marquez court held that the defendant

"lacked standing to contest the installation and use of the GPS device."  Id. at 609.  More

importantly, Marquez was decided before Jones, and Marquez's dictum analysis of the

reasonable-suspicion issue relied on analysis of pre-Jones precedent.  See Marquez, 605 F.3d at

609–10 (citing, inter alia, United States v. Knotts, 460 U.S. 276, 281 (1983) (warrantless

monitoring of beeper when traveling in public) and United States v. Karo, 468 U.S. 705, 714–16

(1984) (warrantless monitoring of beeper inside private residence)).  As discussed supra, the way

the Supreme Court analyzed the Fourth Amendment violation in Jones is markedly distinct from

the approach used in Knotts and Karo and was not predicted by cases like Marquez.

Accordingly, even if Marquez were binding authority in the Third Circuit and even if its analysis

-21-

of the reasonable-suspicion issue were not dictum, its holding would be of questionable persuasive value after Jones.

Michael suffers from similar shortcomings.  Decided in 1981—prior to Jones as well as Knotts and Karo—Michael assumed without deciding that the installation of a beeper on a van was a Fourth Amendment search and stated that "some members of the majority would hold that the installation of the beeper on the van is not a search or seizure at all."  645 F.2d at 256.  The Michael court also reasoned that "[a]lthough the attachment was technically a trespass, 'arcane distinctions developed in property . . . law' are not controlling."  Id. (source of quotation not identified).  The Supreme Court in Jones disagreed with both of those propositions, drastically undercutting the persuasive value of Michael.  See Jones, 132 S. Ct. 954 (observing that the placement of a GPS tracker was a "classic trespassory search").  Moreover, even setting those problems aside and even if Michael were binding on this Court, the continued validity of Michael is dubious.  Michael was decided by a fourteen-to-ten margin over strongly worded dissents, see Michael, 645 F.2d at 261 (Tate, J., dissenting) (describing the use of the beeper as "a trespass that enables [the government] to maintain continuous electronic surveillance over [a person's] movements twenty-four hours per day continuously and indefinitely"), and seven members of the majority, in two concurring opinions, subscribed to the theory rejected in Jones that "attachment of a beeper to an automobile . . . is neither a search nor a seizure," see id. at 259 (Clark, J., concurring).

Because Marquez and Michael do not definitively establish reasonable suspicion as the appropriate standard for GPS tracker installation and tracking, the Court will proceed to balance the intrusion on privacy against the government's law-enforcement needs.

        **b.**      **Balancing Intrusion on Fourth Amendment Interests
With Legitimate Government Interests**

The Court concludes that balancing the intrusion on an individual's Fourth Amendment

interests occasioned by GPS installation and monitoring with the legitimate government interests

in doing so does not justify an exception to the warrant-and-probable-cause requirement in run-

of-the-mill law enforcement situations.

        **i.**      **Invasion of Privacy Interests**

There are two separate components to the infringement on Fourth Amendment rights

occasioned by use of the GPS trackers: installation and subsequent monitoring.  The government

contends that the installation is not intrusive because it does not rely on the car's battery for

power, "[n]othing from the vehicle is removed, and usually no enclosed area is entered."   (Gov't

Resp. 17.)  This far understates the Supreme Court's holding in Jones that installation of a GPS

tracker is a trespass on personal property that is highly repugnant to the Fourth Amendment.[7]

See Jones, 132 S.Ct. at 950 (observing that the Fourth Amendment is "understood to embody a

particular concern for government trespass upon the areas ('persons, houses, papers, and effects')

it enumerates" and describing the installation of the GPS tracker as "the Government

trespassorily insert[ing] the information-gathering device").  Thus, Jones requires that courts

give significant weight to the trespass that occurs when a GPS device is installed on a vehicle.

The privacy interest infringed by monitoring of the GPS device also deserves

considerable weight.  Jones did not reach this issue, but the Jones Court observed that

performing surveillance on a person for a four-week period "through electronic means, without

---

[7] The Fourth Amendment violation in Jones included "use of that device" as well as its
installation.  132 S. Ct. at 949.  However, the Supreme Court focused on the trespass analysis
and did not rule explicitly on the nature of the privacy invasion implicit in monitoring of the GPS
tracker.  Id. at 953–54.

an accompanying trespass" "may be . . . an unconstitutional invasion of privacy."  132 S. Ct. at

953–54 (emphasis added).  This supports defendant's contention that, when there is "an

accompanying trespass," the Fourth Amendment search is constitutionally intrusive enough to

require a warrant.

It is true, as the government points out, that "the Fourth Amendment has been construed,

practically since the beginning of the [United States] government, as recognizing a necessary

difference between a search of a store, dwelling house, or other structure in respect of which a

proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or

automobile for contraband goods, where it is not practicable to secure a warrant, because the

vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be

sought."  Carroll v. United States, 267 U.S. 132, 153 (1925).  The Supreme Court has also held

that "[a] person travelling in an automobile on public thoroughfares has no reasonable

expectation of privacy in his movements from one place to another."  Knotts, 460 U.S. at 281.

Relying on the diminished expectation of privacy in a vehicle, the government asserts that GPS

monitoring for a period of about a month should not be viewed as a grave intrusion on privacy

rights, given that the GPS tracker "does not reveal who is in the car as driver or passenger, what

the occupants are doing, or what they do when they arrive at their destination" and "provides

information only about the vehicle's location."  (Gov't Resp. 18.)

The government's argument overemphasizes what GPS trackers cannot do and

understates what they can do.  The trackers provide information about the vehicle's whereabouts

by periodic pings twenty-four hours a day for approximately a month[8] without regard to where

the vehicle goes, who drives it, or whether agents are still actively monitoring it.  Because

technology has evolved in the intervening years, GPS trackers work differently from the beepers

the Supreme Court considered in Knotts and Karo, and GPS trackers have the potential to be

significantly more intrusive.  As Agent Pedrini testified, the GPS trackers monitor a vehicle's

location around the clock at set periods, logging the location remotely for agents to access later

on.  By contrast, the beepers broadcasted a signal that was only helpful to law enforcement

authorities while they were in close proximity to the beeper.  See Knotts, 460 U.S. at 278.  In

fact, the officers in both Knotts and Karo mostly used the beepers in conjunction with

simultaneous visual surveillance.  See Knotts, 460 U.S. at 278; Karo, 468 U.S. at 708.  Even

more damaging to the government's argument is that the GPS tracker, if it produces location data

while inside the garage of a home or other Fourth Amendment-protected place, has the potential

to yield information that the Supreme Court specifically found in Karo to be protected by the

Fourth Amendment:

> [A]n unreasonable search within the meaning of the Fourth
> Amendment . . . [occurs] where, without a warrant, the
> Government surreptitiously employs an electronic device to obtain
> information that it could not have obtained by observation from
> outside the curtilage of the house. The beeper tells the agent that a
> particular article is actually located at a particular time in the
> private residence and is in the possession of the person or persons
> whose residence is being watched. Even if visual surveillance has
> revealed that the article to which the beeper is attached has entered
> the house, the later monitoring not only verifies the officers'
> observations but also establishes that the article remains on the
> premises.

---

[8] Agent Pedrini testified that battery life of a GPS tracker can be extended by increasing the time
between pings.  (6/21/12 Tr. 66.)  Because the battery life of the trackers in this case was
approximately one month, the Court refers to that time period in this Memorandum.

468 U.S. at 715.

The Court thus concludes that, taken together, the installation of the GPS tracker and subsequent monitoring constitute a significant intrusion on Fourth Amendment privacy rights.

### ii.    Government Interests

Next, the Court must consider the legitimate government interests in GPS monitoring. The government argues that "obtaining a warrant before installing a tracking device on a vehicle would come at great expense to law enforcement investigations." (Gov't Resp. 18–19.) This argument is both unsupported by the evidence and legally unpersuasive.

Contrary to the government's assertions, Agent Pedrini testified that nothing would have prevented him from obtaining a warrant to use GPS tracking and that doing so would not have interfered with his investigation. (6/21/12 Tr. 101–02.) Agent Pedrini opted not to get a warrant because he did not believe he needed one. (E.g., id. at 127 ("Q. But it's something you could have done, you just chose not to? A. Correct.").) Moreover, the government conceded during oral argument that the investigation would not have been impaired by obtaining a warrant for the use of GPS trackers. (See 6/22/12 Tr. 37.) That fact is confirmed by the ability of the investigating agents to obtain a court order permitting the installation of the pole cameras, further supporting defendant's contention that the government could have taken the time to apply for a warrant for GPS tracking sometime during the months-long investigation into the DTG. Importantly, the government has offered no argument or evidence that this case was different from other GPS tracker cases or that similar investigations would be hindered by requiring a warrant.

The government's attempted legal justification for the use of GPS trackers based on reasonable suspicion is also unpersuasive. To justify an exception to the warrant requirement,

the government needs to show "special needs, <u>beyond the normal need for law enforcement</u>."

<u>Skinner</u>, 489 U.S. at 619 (emphasis added).  To be sure, the Supreme Court "has identified

various law enforcement actions that qualify as Fourth Amendment searches or seizures but that

may still be conducted without either a warrant or probable cause."  (Gov't Resp. 16.)  However,

the cases the government cites—with one exception—fall outside the rubric of routine law

enforcement and within the rubric of "special needs."  They are cases about probationers'

diminished privacy interests and states' "dual interest in integrating probationers back into the

community and combating recidivism."  <u>See</u> <u>Samson v. California</u>, 547 U.S. 843, 849 (2006);

<u>see also</u> <u>United States v. Knights</u>, 534 U.S. 112, 121 (2001) (same).  They are cases about the

federal government's "inherent authority to protect, and a paramount interest in protecting, its

territorial integrity."  <u>See</u> <u>United States v. Flores-Montano</u>, 541 U.S. 149, 153 (2004); <u>see also</u>

<u>United States v. Martinez-Fuerte</u>, 428 U.S. 543, 554–55 (1976) (same).  They are cases about the

"substantial need of teachers and administrators for freedom to maintain order" in schools.  <u>See</u>

<u>Vernonia Sch. Dist. 47J</u>, 515 U.S. at 653; <u>see also</u> <u>T.L.O</u>, 459 U.S. at 341–42 (same).  They are

cases about the need to keep police officers safe from unseen and unknown harm during arrests

in a home.  <u>Maryland v. Buie</u>, 494 U.S. 325, 333–34 (1990) (same).  Unlike the case before the

Court, the cases cited by the government are not about routine law enforcement investigative

activity in a criminal context.

 The exception, of course, is one line of cases: <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), and its

progeny, such as <u>United States v. Place</u>, 462 U.S. 696, 702 (1983) ("apply[ing] the principles of

<u>Terry</u>").  The government's argument that GPS tracking can be justified based on a <u>Terry</u>

rationale is unpersuasive.  GPS installation and monitoring—involving a trespass to property and

tracking of a vehicle's whereabouts indiscriminately for over a month—is simultaneously more

intrusive than a <u>Terry</u> stop-and-frisk and less justified by a need to dispel suspicion about "rapidly unfolding and often dangerous situations on city streets." <u>See</u> <u>Terry</u>, 392 U.S. at 10. As <u>Terry</u> made clear, its holding applied to "an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat." 392 U.S. at 21. That "rubric" is simply not the same as the one in which the government seeks to justify the warrantless use of GPS trackers on vehicles. The government does not argue that GPS trackers are devices employed in the heat of the moment to track suspects with the goal of averting imminent crime; instead, the government's usual interest in using GPS trackers is to <u>collect</u> evidence for an investigation. (<u>See</u> 6/22/12 Tr. 17 ("[T]he most typical use of GPS trackers [is,] it's early in the investigation, you're trying to determine what's going on and so you put the tracker on to . . . give you information that you can follow up on.").) Permitting invasive methods to be used as a routine evidence-gathering tool would, as the Court noted at the hearing, "obviate the need to obtain a warrant in every case," (<u>id.</u> at 20). <u>See</u> <u>Terry</u>, 392 U.S. at 20 (observing that "the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure"); <u>see also</u> <u>City of Indianapolis v. Edmond</u>, 531 U.S. 32, 48 (2000) (rejecting argument that search or seizure falls within special needs rubric when "primary purpose" of search or seizure is "ultimately indistinguishable from the general interest in crime control").

For the above-stated reasons, the Court concludes that the intrusion on Fourth Amendment privacy interests occasioned by GPS tracker installation and monitoring is substantial and that the government has not identified any legitimate law enforcement need to use such devices beyond "the normal need for law enforcement." <u>Cf.</u> <u>Griffin</u>, 483 U.S. at 873

(citation omitted).  The Court thus concludes that the GPS installation and monitoring in this case cannot be justified by a showing of reasonable suspicion.[9]

### 2.    The Automobile Exception

### i.    Parties' Arguments

The government next asserts that defendant's Fourth Amendment rights were not violated because the automobile exception to the warrant requirement should apply.  Specifically, the government contends:

> When they put the GPS device on the Blue Pickup [Truck] on January 24, 2011, the agents had information at their disposal that Miguel Ortiz was using this truck to transport drug-related contraband for the DTG.  Given this probable cause, and the fact that the object of the search was a motor vehicle, the agents were not obligated to obtain a warrant under the automobile exception to the warrant requirement.  Cf. New York v. Class, 475 U.S. 106, 117–119 (1986) (officer's momentary reaching into the interior of a vehicle to expose the VIN was reasonable where officer had "some probable cause focusing suspicion on the individual affected by the search").

Government counsel acknowledged at the hearing that courts apply the automobile exception to permit a warrantless search of the interior of a vehicle "when there's probable cause to believe a vehicle contains contraband."  (6/22/12 Tr. 24 (emphasis added).)  However, according to the government, "the reasoning and logic of that exception would apply . . . with greater force when you're discussing the placement of GPS on a vehicle, because the underlying principles of the automobile exception were twofold: One, that an automobile is readily moveable and . . . secondly, there's a lessened expectation of privacy with respect to an automobile . . . ."  (Id.)

---

[9] The Court does not determine whether the DEA agents had reasonable suspicion when the trackers were installed.

Defendant takes the position that the automobile exception only applies where government agents search inside a vehicle based on probable cause to believe the vehicle contains contraband.  (Id. at 54–55.)  His counsel argued at the hearing that the policy behind the automobile exception is not implicated by the government's interest in GPS tracking and, thus, does not support extending that exception.  (Id. at 50.)

### ii.    Analysis

The government does not rely on the theory that agents were entitled to place a GPS tracker on defendant's vehicle because it contained contraband at the time that the tracker was placed.  Agent Pedrini did testify—albeit equivocally and without using the phrase "probable cause"—that the blue pickup truck contained evidence of criminal activity at the moment when Tracker Number Two was installed.[10]  (6/21/12 Tr. 97, 100 (stating that there were "[p]ossibly" or "could have been" drug transaction tally sheets in the truck's passenger compartment).)  Agent Pedrini also testified that he believed the drug proceeds were in the Westmoreland Street garage, not in the blue pickup truck, at the time of installation.  (Id. at 99–100.)  Earlier in his testimony he stated that, when Tracker Number Two was installed, he believed he had probable cause that the blue pickup truck would again be "used to transport drug proceeds."  (Id. at 94–95.)  That is the theory on which the government relies: that the automobile exception permits GPS tracking of a vehicle without a warrant when there is probable cause to believe the vehicle is being used in furtherance of criminal activity.

The difficulty with the government's argument is that, as presently interpreted, the automobile exception to the warrant requirement permits "warrantless searches of any part of a

---

[10] There is no evidence that the Blue Pickup Truck contained contraband when Tracker Number One was installed.

vehicle that may conceal evidence . . . where there is probable cause to believe that the vehicle contains evidence of a crime." United States v. Salmon, 944 F.2d 1106, 1123 (3d Cir. 1991) (citing United States v. Ross, 456 U.S. 798, 825 (1982)) (emphasis added); see also United States v. Burton, 268 F.3d 91, 100 (3d Cir. 2002) (applying automobile exception when agents "observed [the defendant] leave what they thought to be a drug deal and place the results of that transaction in his trunk").  The authority is uniform that the automobile exception permits a search of the vehicle's interior, including of a container within the vehicle, when there is probable cause to believe contraband is contained therein.  See, e.g. Maryland v. Dyson, 527 U.S. 465, 467 (1999) (per curiam) (probable cause to search trunk for cocaine); Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (per curiam) (same); California v. Acevedo, 500 U.S. 565, 577 (1991) ("[T]he Fourth Amendment does not compel separate treatment for an automobile search that extends only to a container within the vehicle."); United States v. Ross, 456 U.S. 798, 824 (1982) (probable cause to search closed bag in trunk for heroin).  Even assuming there was probable cause to believe the blue pickup truck contained drug-transaction tally sheets at the time Tracker Number Two was installed, the automobile exception did not authorize installation of a GPS tracking device; at best, it would have authorized a search of the vehicle for that contraband in the parking lot of the Sugar House Casino.

Counsel for the United States candidly acknowledged that no court has expanded the automobile exception to permit warrantless GPS installation and monitoring. (6/22/12 Tr. 25.) The government argues instead that this Court should be the first to extend application of the automobile exception, relying on the rationale underlying the exception—"the 'ready mobility'

of automobiles."[11]  See Burton, 288 F.3d at 100 (quoting Dyson, 526 U.S. at 466–67).  Because

this Court is bound by the limits of existing precedent, it declines to extend the government's

authority under the Fourth Amendment.  See A.A. ex rel. E.A. v. Exeter Twp. Sch. Dist., 485 F.

Supp. 2d 587, 591 (E.D. Pa. 2007) (observing that "[i]t is axiomatic that a district court is bound

to apply its appellate court's precedent").

      Moreover, the exigency rationale for the automobile exception does not justify extending

it to cover warrantless installation of GPS trackers, at least not on the record before this Court.

The automobile exception applies when there is no time to apply to a magistrate because "an

immediate intrusion is necessary if police officers are to secure the illicit substance."  Ross, 456

U.S. at 806.  In this case, there was ample time for the agents to apply for a warrant to track

defendant's car, as they did for an order to install pole cameras.  Moreover, Agent Pedrini's

purpose in installing the GPS tracker was to further his investigation and was not based on any

concern about a fleeting opportunity to seize contraband or thwart criminal activity.  (See

6/21/12 Tr. 101, 144 (stating that the goal of installing it was "to watch Miguel Ortiz deliver

these drug proceeds to a tractor trailer . . . and then follow the tractor trailer out of the area, and

take off the tractor trailer and seize the money, and continue our investigation of the Nelson

Rodriguez drug-trafficking organization").  Agent Pedrini testified that he could have obtained a

warrant if he believed he needed one without impairing the investigation.  (6/21/12 Tr. 101–02.)

Again, the government has offered no argument or evidence that this case is different from the

---

[11] As the government noted at oral argument, it is important to delineate the theoretical
underpinning of the automobile exception—that vehicles can be moved quickly, taking
contraband within them along for the ride—from the showing required to sustain a search under
the automobile exception.  Agents need only have probable cause to search pursuant to the
automobile exception; they do not have to show that exigency is also present.  See Dyson, 527
U.S. at 467 (emphasizing that "the automobile exception does not have a separate exigency
requirement").

average case in which agents use GPS trackers; in fact, Agent Pedrini testified that his purpose in

using the trackers in this case was consistent with his purpose in using them generally—that is,

as an investigative tool.  (See id. at 61–62.)  Thus, the "ready mobility" of automobiles that is the

reason why the automobile exception exists, see Burton, 288 F.3d at 100, does not present a

justification for extending application of the automobile exception to permit GPS tracking.

 The Court's decision on this point is in accord with the conclusion reached by the Katzin

court.  See 2012 WL 1646894 at *6 ("The rationale underlying the automobile exception does

not justify the warrantless installation of a GPS tracker, at least under the facts presented here.

Certainly, the Government's Katzin investigation efforts could not qualify for the exception as it

currently exists.").   The government argues that Katzin erred because the rationale for the

automobile exception "is surely as applicable where the 'search' is the placement of a GPS

device rather than entry to the vehicle and a full search for contraband" and because Katzin

improperly applied an exigency requirement.  (Gov't Resp. 31–33.)  This Court rejects the first

contention for the above-stated reasons.  As to the second, the Court disagrees with the

government's reading of Katzin.  While Katzin did state that the facts before it disclosed "no

exigency requiring quick action," 2012 WL 1646894 at *6, this Court does not interpret that

portion of the opinion as interposing an "exigency" element to the automobile exception in

contravention of Dyson, 527 U.S. at 467.  Instead, the Katzin court reasoned, as does this Court,

that the rationale for the automobile exception does not justify extending it to cover warrantless

GPS tracking.

 The Supreme Court could broaden the automobile exception to cover circumstances in

which government agents have probable cause to believe that a vehicle is being used in

furtherance of criminal activity.  The present state of the law, however, does not authorize such

an extension, and this Court does not conclude that an extension is justified based on the record before it.  The automobile exception therefore does not apply to permit the government's warrantless installation and monitoring of a GPS tracking device.[12]

### 3.    Conclusion

The Court concludes that the search in this case cannot be supported based on reasonable suspicion or by the automobile exception.  Therefore, in the absence of a warrant, the installation and monitoring of the GPS trackers on defendant's vehicle was an unreasonable search within the meaning of the Fourth Amendment.

### C.    Whether the Exclusionary Rule Applies

Having concluded that a Fourth Amendment violation occurred when the government installed GPS trackers and monitored them, the Court must next consider if the appropriate sanction is suppression of the evidence under the exclusionary rule, which requires exclusion of evidence seized in violation of the Fourth Amendment in certain circumstances.  Whether "the exclusionary sanction is appropriately imposed in a particular case . . . is 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'"  United States v. Leon, 468 U.S. 897, 906 (1984) (quoting Illinois v. Gates, 462 U.S. 213, 223 (1983)).

Because the parties' arguments center on how the Court should apply the Supreme Court's decision in United States v. Davis, 131 S. Ct. 2419 (2011), the Court briefly reviews the history of the exclusionary rule and the holding of Davis before summarizing the positions of the government and defendant in this case.

---

[12] Because the Court concludes that the automobile exception does not apply and the government did not obtain a warrant, it does not reach the issue of whether the government had probable cause at the time either GPS tracking device was installed.

## 1.    The Exclusionary Rule and <u>Davis v. United States</u>

"The exclusionary rule was adopted to effectuate the Fourth Amendment right," but not every Fourth Amendment violation requires suppression of evidence.  <u>See</u> <u>United States v. Calandra</u>, 414 U.S. 338, 347 (1974). The "purpose of the rule is not to redress the injury to the privacy of the search victim"; instead, its "prime purpose is to deter future unlawful police conduct."  <u>Id.</u> (citing, <u>inter alia</u>, <u>Mapp v. Ohio</u>, 367 U.S. 643 (1961)).  Beginning with <u>United States v. Leon</u>, 468 U.S. 897, 919 (1984), the Supreme Court has held that the exclusionary rule does not apply where it would "deter objectively reasonable law enforcement activity."  <u>Leon</u> identified one such situation: "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope."  <u>Id.</u> at 920.  The Supreme Court has since expanded the so-called "<u>Leon</u> good-faith exception."  <u>See</u> <u>Arizona v. Evans</u>, 514 U.S. 1, 14 (1995) (extending exception to cover arrest by officer reasonably relying on database of arrest warrant that contained incorrect information where database maintained by judicial employees); <u>see also</u> <u>Herring v. United States</u>, 555 U.S. 135, 137 (2008) (extending <u>Evans</u> to cover police recordkeeping errors;  <u>Illinois v. Krull</u>, 480 U.S. 340, 349–50 (1987) (extending exception to cover search conducted reasonably relying on later-invalidated statute); <u>Massachusetts v. Shepard</u>, 468 U.S. 981, 990 (1984) (extending exception to cases where warrant invalid due to judge's clerical error).

In 2011, the Supreme Court decided <u>Davis v. United States</u>, in which the defendant, a passenger in a vehicle, was arrested for possession of a firearm following a vehicle search incident to his arrest for giving a false name to police.  131 S. Ct. at 2425–26.  The search was lawful under the Supreme Court precedent in effect at the time of the search, <u>New York v. Belton</u>, 453 U.S. 454, 458–59 (1981), as interpreted by the Eleventh Circuit in <u>United States v. Gonzalez</u>, 71 F.3d 819, 822, 824–27 (1996).  <u>Davis</u>, 131 S. Ct. at 2426, 2428.  While the

defendant's case was on direct appeal, the Supreme Court decided <u>Arizona v. Gant</u>, 556 U.S. 332 (2009), which limited the scope of <u>Belton</u>. <u>Davis</u>, 131 S. Ct. at 2426. Under <u>Gant</u>, the search leading to the defendant's arrest would have been unlawful. <u>Davis</u>, 131 S. Ct. at 2426. Because <u>Gant</u> was decided while his case was on direct appeal and applied retroactively to his case, the defendant argued that suppression of the firearm was required.

Reasoning that the exclusionary rule "'should not be applied to deter objectively reasonable law enforcement activity,'" the Supreme Court held that evidence obtained when "the police conduct a search in objectively reasonable reliance on binding judicial precedent" should not be suppressed. <u>Id.</u> at 2428–29. Accordingly, because the search that led to the defendant's arrest was conducted in compliance with then-binding law, <u>Belton</u> and <u>Gonzalez</u>, the exclusionary rule did not apply, and the evidence recovered from the vehicle search incident to arrest was admissible. <u>Id.</u>

In his dissent in <u>Davis</u>, Justice Breyer predicted the issue presented in this case: how should this Court apply the holding of <u>Davis</u> in light of <u>Jones</u> when the binding appellate court— in this case, the Third Circuit—had not ruled on the constitutionality of warrantless GPS tracking, and when some other courts (but not all) had held that the investigative practice was constitutionally permissible? <u>See</u> <u>Davis</u>, 131 S. Ct. at 2437 (Breyer, J., dissenting) ("What about a rule that all other jurisdictions, but not the defendant's jurisdiction, had previously accepted? What rules can be developed for determining when, where, and how these different kinds of precedents do, or do not, count as relevant 'binding precedent'?").

Prior to <u>Jones</u>, and prior to the search in this case, the Seventh and Ninth Circuits had held that installation and monitoring of a GPS tracker was not a Fourth Amendment search. <u>United States v. Pineda-Moreno</u>, 591 F.3d 1212, 1217 (9th Cir. 2010), <u>vacated</u>, 132 S. Ct. 1533

(Feb. 21, 2012); United States v. Garcia, 474 F.3d 994, 996–98 (7th Cir. 2007).  The Eighth

Circuit had held that GPS installation and tracking was a Fourth Amendment search but could be

supported by reasonable suspicion.[13]  United States v. Marquez, 605 F.3d 604, 609–10 (8th Cir.

2010).  The D.C. Circuit had held that GPS tracking required a warrant.  United States v.

Maynard, 615 F.3d 544, 560 (D.C. Cir. 2010), aff'd on other grounds sub nom. United States v.

Jones, 132 S. Ct. at 949.  No other circuits had ruled on the issue.

### 2.    Parties' Arguments

The government argues that the evidence should not be suppressed because the

investigating agents "acted in objective good faith on the basis of existing law."  (Gov't Resp.

34.)  In support of that argument, the government points out that "[i]n light of the consensus

among [the] courts [that addressed the question] that a warrant was not required to conduct GPS

surveillance, a reasonable police officer would believe that the Fourth Amendment's warrant

requirement did not apply to such circumstances, and there would be no deterrent value in

suppressing evidence obtained as a result."  (Id. at 39; see also 6/22/12 Tr. 30 (arguing that the

agents relied reasonably on "the state of the law" as of January 24, 2011).)  In the alternative,

interpreting Davis as being based on the culpability of government agents who violate the Fourth

Amendment, the government contends that exclusion is inappropriate because the DEA agents'

conduct was "anything but the type of deliberate or grossly negligent misconduct to which the

exclusionary rule exclusively applies."  (Gov't Resp. 39.)

---

[13] In an opinion issued after the investigation in this case had completed, the Fifth Circuit
adopted this view. United States v. Hernandez, 647 F.3d 216, 221 (5th Cir. 2011).  The
government cites United States v. Michael, 645 F.2d 252 (5th Cir. 1981) (en banc) in support of
its argument, but, as discussed supra, Michael, even assuming arguendo its continued validity, is
inapposite because it was decided before Knotts and Karo and involved tracking using a beeper.

Defendant responds that exclusion is appropriate in this case because application of the exclusionary rule would result in deterrence of illegal conduct, and the benefits of deterrence would outweigh the cost of suppression.  (Def. Mem. 6–7.)  According to defendant, the DEA agents should have known their actions required a warrant notwithstanding the unanticipated rationale of the Jones decision because "placement of a foreign object on a personal vehicle" clearly equated to "intentional[] inva[sion of] private property belonging to a citizen without excuse or legitimate reason for doing so."  (Id. at 7 (citing Illinois v. Krull, 480 U.S. 340, 348–49 (1987)).)  The costs of exclusion are low because generally, "and[,] as in this case, the use of a GPS device is usually a mere part of an investigation rather than the sine qua non of a prosecution."  (Id. at 8.)  Defendant further asserts that the deterrence value of exclusion is high because investigations will not be impaired if agents need to seek a warrant before installing a GPS tracker.  (Id. at 9–10.)  As to how the Davis court's "binding appellate precedent" standard should apply, defendant responds that when a law enforcement agent knows "that different circuits are doing different things . . . then you can't even possibly think that this is good faith, it's willful blindness."  (6/22/12 Tr. 53–54; see also id. at 56 (emphasizing that, at the time of the search, "there was nothing in the Third Circuit").)

### 3.    Analysis

Davis stands for the proposition that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule."  131 S. Ct. at 2429 (emphasis added). The government acknowledges that there was no Third Circuit case "that addresses the legality and lawfulness of both the placement and then the monitoring of a GPS," (6/22/12 Tr. 30), and it is axiomatic that decisions of other circuits do not bind the Third Circuit, see In re Grossman's Inc., 607 F.3d 114, 121 (3d Cir. 2010).

Therefore, the government's position is tenable—and the exclusionary rule does not apply—if at least one of the following three propositions is true: (1) <u>Davis</u> extends to an officer's good-faith reliance on persuasive, non-binding appellate precedent; (2) the "binding appellate precedent" on which the DEA agents relied is the Supreme Court's opinions in <u>Knotts</u> and <u>Karo</u>; or (3) <u>Davis</u> extends to all investigative efforts undertaken in violation of the Fourth Amendment as long as the law enforcement agent acted reasonably and in good faith.  The Court examines and rejects each of these premises in turn.

First, the Court rejects the proposition that an officer's good-faith reliance on persuasive, non-binding appellate precedent validates an otherwise unlawful search.  <u>Davis</u> does not refer to persuasive or well-reasoned precedent, permit reliance on a growing trend in decisions, or purport to apply to situations in which a plurality, majority, or even overwhelming majority of circuits agree.  Instead, <u>Davis</u> states, repeatedly, that it applies to <u>binding</u> precedent.  131 S. Ct. at 2423–24, 2426, 2428, 2429, 2432–34.

This holding is further demonstrated by the treatment of the vehicle search incident to arrest in <u>Davis</u>.  The Supreme Court emphasized that the agents had acted exactly in accordance with <u>Gonzalez</u>, the applicable circuit court case in Alabama, where the search occurred.  <u>Davis</u>, 131 S. Ct. at 2428 (observing that "the officers' conduct was in strict compliance with then-binding Circuit law and was not culpable in any way" and that the officers "followed the Eleventh Circuit's <u>Gonzalez</u> precedent to the letter"). The Court thus rejects the government's argument that <u>Davis</u> applies when "every court of appeals to consider the question—with the exception of [one]" rules a certain way.  (Gov't Resp. 37–38.)  Read as a whole, <u>Davis</u> only applies when there is extant legal authority that is binding in the jurisdiction in which the law enforcement action is undertaken.

Second, implicit in the government's argument is the proposition that the exclusionary rule does not apply if the Supreme Court's "beeper search" cases, United States v. Knotts, 460 U.S. 276 (1983), and United States v. Karo, 468 U.S. 705 (1984), qualify as "binding precedent" under Davis.[14]   (Gov't Resp. 37–38.)  Taken together, those cases stand for the proposition that, while no Fourth Amendment search occurs when law enforcement authorities track a beeper inside a vehicle while it is in a publicly viewable location, a search occurs when the beeper is monitored that is within a private residence.  See Karo, 468 U.S. at 714.  The record reveals that Agent Pedrini may have been relying on that proposition—albeit misguidedly—in his approach to GPS tracking in this case.  (E.g., 6/21/12 Tr. 67 (stating that agents did not need a warrant to install the tracker "if the vehicle was parked on a public way, on a public street" but did need one "if the vehicle was parked inside of a garage").)

The Court concludes that Knotts and Karo are not "binding appellate precedent" for the purposes of applying Davis to this case. The government may have anticipated that the Supreme Court would extend Knotts and Karo to cover installation and monitoring of a GPS device, but there are two problems with that reasoning.  First, even accepting the factual similarities between beepers and the GPS trackers, the essential holding of Jones was that the trespass occurred when the GPS tracker was placed on the vehicle.  That question was not presented by Knotts or Karo, in which the beepers were installed in containers that later came into the defendants' possession. See Jones, 132 S. Ct. at 951–52 (describing the defendant in Jones as being "on much different

---

[14] The government does not rely on the Third Circuit's subsequent interpretation or extension of those cases.  Knotts has been cited by the Third Circuit only once, and Karo twice—once in the same case that cited Knotts, and once in a dissent.  The case citing both Knotts and Karo dealt with a related yet factually distinct question of statutory interpretation as to the government's authority to obtain a cellular telephone customer's cellular tower data.  See In re Application of the United States of America, 620 F.3d 304 (3d Cir. 2010).

footing" than the <u>Knotts</u> and <u>Karo</u> defendants because he owned the vehicle at the time the government installed the GPS tracker).  Contrary to Agent Pedrini's understanding, <u>Knotts</u> and <u>Karo</u> decided where surveillance using a tracking device may take place, not where or how a tracking device can be installed.

Moreover, as much as <u>Davis</u> made clear that its holding extended only to binding precedent, it also made clear that its holding is limited to cases where "binding appellate precedent <u>specifically</u> authorizes a <u>particular</u> police practice."  131 S. Ct. at 2429 (emphasis added); <u>see also</u> <u>Davis</u>, 131 S. Ct. at 2428 (observing that "the officers' conduct was in <u>strict compliance</u> with then-binding Circuit law" and that the officers "followed the Eleventh Circuit's <u>Gonzalez</u> precedent <u>to the letter</u>" (emphasis added)).  <u>Knotts</u> and <u>Karo</u> were decided almost twenty years before the investigation in this case, addressed different technology in a world that used technology very differently, and specifically stated that they did not reach the question of the constitutionality of installing a tracking device on a person's property to perform surveillance.  The Court thus concludes that <u>Knotts</u> and <u>Karo</u> did not "specifically authorize[]" warrantless GPS installation and tracking, <u>see</u> <u>Davis</u>, 131 S. Ct. at 2429, and are thus not "binding appellate precedent" for the purposes of <u>Davis</u>.

The government's final argument rests on interpreting <u>Davis</u> to cover the actions of "agents who, based on the near-unanimity of the case law at the time, reasonably believed that they were acting in conformity with the then-existing law and did not exhibit the deliberate, reckless, or grossly negligent behavior that can be sanctioned by exclusion."  (Gov't Resp. 41–42.)  The government relies on language in <u>Davis</u> that it interprets as curtailing the application of the exclusionary rule such that it would only apply, regardless of compliance with binding appellate precedent, if the Court were to find that the DEA agents acted with a culpable mental

state when they installed the GPS trackers.  See Davis, 131 S. Ct. at 2428–29 ("Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningfu[l]' deterrence, and culpable enough to be 'worth the price paid by the justice system.'" (quoting Herring, 555 U.S. at 144).)

The Court rejects the government's proffered reading of Davis.  First, the sentence relied on by the government is dicta that must be read in context.  In the paragraph in which that sentence appears and the paragraph preceding it, the Supreme Court was reasoning that the facts in Davis showed an "absence of police culpability" because "the officers' conduct was in strict compliance with then-binding Circuit law."  Id. at 2428–29 (describing the defendant's argument in Davis as an "attempt . . . to penalize the officer for the appellate judges' error" (alterations and quotation marks omitted)).  Read in that context, the Court concludes that Davis holds that strict compliance with appellate precedent is covered by Leon because strict compliance necessarily entails good faith and nonculpability.

Because Davis does not resolve this case, the Court must apply the general standard for application of the exclusionary rule: whether "the benefits of deterrence . . . outweigh the costs" of the application of the exclusionary rule.  See Herring, 555 U.S. at 141 (citing Leon, 468 U.S. at 910).  The Court concludes that the benefits of deterrence outweigh the costs of applying the exclusionary rule in this case.  Agent Pedrini may well have believed he was acting lawfully and according to DEA policy[15] when he arranged for the installation of two separate GPS trackers

_____

[15] Whether this actually was DEA policy in this District is not clear.  Cf. United States v. Yokshan, 431 F. App'x 170, 171–72 (3d Cir. 2011) (affirming decision from Eastern District of Pennsylvania) ("On August 18, 2008, Special Agent Jeffrey Lauriha of the DEA applied for a warrant authorizing the installation and use of a global positioning system tracking device (a "GPS") to monitor [the defendant's] car. . . . A United States Magistrate granted the warrant, which was to expire after 45 days.").

without warrants, but the Davis requirement of "binding appellate precedent" means that government agents should not be and need not be vested with discretion in predicting or anticipating how the law will develop and how it should be applied. That is exactly the problem presented when an agent testifies that he "think[s]" he knew that "other jurisdictions" disapproved of warrantless GPS tracking but this District permitted it. (6/21/12 Tr. 126–27.) The solution is simple: the import of Davis is that officers acting without clearly applicable binding appellate guidance should err on the side of caution and obtain a warrant. See Karo, 468 U.S. at 717–18 ("Requiring a warrant will have the salutary effect of ensuring that use of beepers is not abused, by imposing upon agents the requirement that they demonstrate in advance their justification for the desired search. . . . [I]f truly exigent circumstances exist no warrant is required under general Fourth Amendment principles."). As Agent Pedrini's testimony established, applying to a magistrate judge for a warrant would not have impaired or delayed the investigation in any way. (Id. at 102–02, 126–27.) Most importantly, taking the time to apply for a warrant—as the agents did in obtaining the court order for the pole cameras—would have averted violations of the Fourth Amendment rights of three individuals, one of whom was completely innocent, (id. at 113). See Karo, 468 U.S. at 717–18 ("Those suspected of drug offenses are no less entitled to that protection than those suspected of nondrug offenses.").

    This Court's decision is in agreement with the only two cases to have addressed the applicability of Davis to warrantless GPS installation and monitoring in circuits that had not addressed the constitutionality of the use of such devices. See Katzin, 2012 WL 1646894, at *7–10; United States v. Lee, Cr. No. 11-65-ART, __ F. Supp. 2d __, 2012 WL 1880621, at *6–9 (E.D. Ky. May 22, 2012) (reasoning in the absence of Sixth Circuit precedent that, inter alia, when "a police officer conducts a search based on a non-binding judicial decision—that is, an

opinion by a trial court, an unpublished opinion by his own circuit's court of appeals, or a published opinion by another circuit's court of appeal—he is guessing at what the law might be, rather than relying on what a binding legal authority tells him it is").[16]  As the government concedes, the other cases it cites in support of its position are from circuits where precedent prior to Jones had permitted warrantless GPS installation and tracking.  (See Gov't Resp. 41 n.8.)  Those cases are inapposite and do not compel a different conclusion than the one reached in this Memorandum.  Furthermore, the criticisms the government levels at the decisions in Katzin and Lee—that they did not "address the penumbra of Supreme Court precedent which suggested the validity of warrantless GPS installation, the marked break in precedent represented by the majority decision in Jones, or the broader conclusion of recent Supreme Court decisions that the exclusionary rule should only apply to culpable police conduct," (id.)—have been addressed and rejected for the reasons set forth above, and the Court need not repeat them.

## V.   CONCLUSION

The installation and monitoring of GPS trackers on defendant's vehicle without a warrant violated defendant's Fourth Amendment rights, and the exclusionary rule requires exclusion of evidence obtained through use of those GPS trackers.  See United States v. Stabile, 633 F.3d 219, 243 (3d Cir. 2011) (citing Wong Sun v. United States, 371 U.S. 471, 485 (1963)).  The Court thus grants defendant's Motion to Suppress Evidence.

An appropriate Order follows.

---

[16] Another Sixth Circuit district court noted in dicta in a footnote that it "would find it persuasive" if the government were to advance the theory that Davis applied "because the use of a GPS device on a vehicle without first obtaining a search warrant was a widely-accepted practice in the police community that had not been held unconstitutional by the Sixth Circuit Court of Appeals."  United States v. Luna-Santillanes, No. 11-20492, 2012 WL 1019601, *9 n.5 (Mar. 26, 2012) (emphasis added).  For the reasons set forth above, this Court disagrees and concludes that Luna-Santillanes far overstates the holding of Davis.